COZY LAKE, INCORPORATED, complainant-appellant,

*v.*

NYODA GIRLS' CAMP, INCORPORATED, defendant-respondent.

[Submitted October 30th, 1925.   Decided February 1st, 1926.]

1. The law requires that a party over whose land a stream passes should use the water in a reasonable manner. He must not destroy or render useless, or materially diminish or affect, the application of the water by the proprietors above or below on the stream.

2. A party may build a dam across a stream on his own land, provided that thereby he does not appreciably diminish the amount of water which should naturally flow onto the land of his neighbor below or materially affect the continuity of the flow.

3. An upper owner is not making a reasonable use of a stream where he erects a dam, the maintenance of which will materially interfere with the flow of the stream to the land of a lower proprietor.

On appeal from a decree of the court of chancery advised by Vice-Chancellor Church, whose opinion is reported in *97 N. J. Eq. 180.*

*Mr. I. Henry Coyne (Mr. Merritt Lane,* of counsel), for the complainant-appellant.

*Messrs. King & Vogt (Mr. Harold A. Price,* of counsel), for the defendant-respondent.

The opinion of the court was delivered by

KATZENBACH, J.

This is an appeal from a final decree of the court of chancery dismissing the complainant's bill. The complainant below and the appellant in this court (hereinafter referred to as the complainant) is a New Jersey corporation owning a tract of land in Jefferson township, Morris county, New Jersey, of approximately one hundred and seventy-five acres, which it is engaged in developing for summer resort purposes. Through this tract of land there originally flowed a stream which rose in the mountains or hills to the north of the tract, and, eventually, found its way into the Rockaway river. The stream flowed in a southerly direction. It was what is termed a live stream—that is, there was a constant flow of water therein during all seasons of the year. It was never dry. Like all streams, its width and flowage varied with the rainfall and seasons. At some time it would be six feet in width, and in the summer season, with a scant rainfall, would narrow to ten inches. Adjoining the complainant's property on the north and nearer to the source of the stream, the defendant below (hereinafter called the defendant), a New Jersey corporation, known as the Nyoda Girls' Camp, Incorporated, owned a large tract of land used for the outdoor activities of the Camp Fire Girls of Montclair and vicinity. This tract was acquired by the defendant in 1919. Upwards of twenty years prior to its acquisition there was located on the tract a pond about two or three acres in extent created by a dam across the stream. In order

to provide a larger ʼbody of water for use of the Camp Fire Girls, the predecessor in title of the defendant had immediately, before transferring the property to the defendant, erected a concrete core dam on the lower portion of the property. This was in addition to the dam already erected. This created a lake some ten or twelve acres in extent. The new dam contained a spillway some three feet below the top of the dam. In the spillway there were first placed removable batter-boards twenty-four inches in height. In September, 1922, a gate was installed in the spillway to regulate the flow of water to a water wheel erected below the dam. The gate was twenty-four inches high. In the spring of 1924 the gate was replaced by new batter-boards claimed to be of the same height as the gate and former batter-boards. The defendant claimed that the reason for the substitution was that the batter-boards were more easily removable than the gate in times of freshet. It was admitted by the defendant that the batter-boards were used to maintain the prior level of the lake.

The complainant, after the acquisition of its property in 1922, erected a dam for the purpose of creating a lake of some forty acres in extent. When the defendant was maintaining the gate in the spillway it would raise the gate for the purpose of operating a water wheel used in connection with its electric plant. This resulted in supplying the complainant's lake with water. In the summer of 1924 the rainfall was slight. The defendants kept the batter-boards up so that the water was held back and none reached the complainant's lake unless by seepage. It is not denied that during the summer of 1924 the water of the stream was not permitted to reach the complainant's property. The defendant's contention at the hearing was that the complainant was entitled only to such a flow as might pass over the batter-boards. As the water from the stream, due to the drought, did not flow into the defendant's lake in sufficient quantity to raise the water to the level of the batter-boards, the complainant had no flow of water into its lake. It was not denied that during this period water flowed from the stream into the defendant's lake. A witness for the defend-

ant testified that in August, 1924, the flow of the stream was one hundred ten-quart pails in three and one-half minutes, or four thousand two hundred and eighty-five gallons per hour.

At the conclusion of the hearing the vice-chancellor delivered an oral opinion which, in effect, adopted the contention of the defendant. He said:

"The sole question in this case, as I see it, is whether the complainants are deprived of an amount of water which they would have if the batter-boards were not put up. According to the testimony they were batter-boards, and they were taken down, and for a year and a half, perhaps, there were gates there. Then the gates were removed, the batter-boards were restored. The flow of water, according to the evidence, is a matter of fact. It does not seem to me to be any less now that the batter-boards are there than when the gates were there. Therefore, the sole question is whether the complainants are deprived of the proper and usual flow of this stream. I do not think they are. I think they get about as much water now as they did before. I will dismiss the complaint."

This deliverance met with so pronounced a protest from complainant's counsel that the court permitted counsel to file a brief. Subsequently, a written opinion was filed which declared the law of the case to be as stated by former Vice-Chancellor Emery in the case of *Mayor, &c., of Paterson* v. *East Water Company, 74 N. J. Eq. 49.* The following paragraph, taken from Vice-Chancellor Emery's opinion, is set forth in the opinion below, namely—

"All that the law requires of the party by or over whose land a stream passes is that he should use the water in a reasonable manner, and so as not to destroy or render useless, or materially diminish or affect, the application of the water by the proprietors above or below the stream."

We accept this as the law of the present case.

The vice-chancellor then applied the law as stated to the facts of the present case in the following language:

"The question, therefore, it seems to me, is entirely one of fact as to whether the complainant is deprived of the proper and usual flow of this stream. I do not think it is. It purchased its property after defendant's dam was erected, and there is no testimony to show that any water is diverted from its usual channel, and the loss from evaporation and soakage into the ground is not shown to be material.

"I think the complainant receives as much water now that the batter-boards are replaced as it did before, and I shall therefore advise a decree dismissing the bill."

In this application of the law to the evidence we do not agree with the conclusions of the learned vice-chancellor. In the first place, he finds that the complainant was not deprived of the proper and usual flow of the stream. The evidence is that during the summer of 1924, at the peak of the drought, the stream as it entered the defendant's lake had a flow of four thousand two hundred and eighty-five gallons per hour. Not a drop of this water, except such as may have by seepage found its way through the earthen portion of the defendant's dam, reached the complainant's property. This, we think, was a substantial deprivation of the complainant's rights. In the recently decided case of *Exton v. Glen Gardner Water Co., 129 Atl. Rep. 255* (not yet officially reported), Vice-Chancellor Buchanan held that a diversion of four gallons a minute (two hundred and forty gallons an hour) is of such perceptible amount as not to be excluded under the *"de minimis"* maxim. A man may build a dam across a stream on his own land, provided that thereby he does not appreciably diminish the amount of water which should naturally flow onto the land of his neighbor below, or materially affect .the continuity of the flow * * *. But an upper owner is not making a reasonable use of the stream, and, therefore, incurs liability where he erects a dam, the maintenance of which will virtually amount, through the resulting evaporation or percolation, to the drying up of the stream, to the injury of lower owners, or which will materially interfere with the flow, or with the continuity of

power supplied by the stream to a lower proprietor. *27 Rul. Cas. L. 1101* § *37.*

The next ground stated by the vice-chancellor for a dismissal of the bill appears to be that the complainant purchased the property after the defendant's dam had been erected. The fact that the dam was erected prior to the complainant's acquisition of its property is no ground for denying to the complainant the proper and usual flow of the stream. The defendant had obtained no prescriptive right to the maintenance of the new dam. The complainant acquired by its purchase all the rights of the former owner, of which one was the right to have the water of the stream come to its property in its natural flow, undiminished in quantity and unimpaired in quality. *East Jersey Water Co.* v. *Bigelow, 60 N. J. Law 201.*

The statement is reiterated in this part of the opinion that there is no testimony to show that any water is diverted from its usual channel. The evidence appears as to this has already been considered. There appears to be little evidence on the subject of evaporation and seepage. As the lake was, at least, trebled in size by the erection of the new dam, it would seem to follow that evaporation and seepage would increase. There is no present need, however, to consider this question.

The final ground stated by the vice-chancellor for the dismissal of the bill is that the complainant receives as much water, now that the batter-boards are replaced, as it did before. This is a repetition of the reason stated in his oral deliverance. We do not deem the issue in this case to be the question whether or not the complainant receives as much water with the batter-boards up as it did when the gate was in the spillway.

The question presented, as we view the case, is whether the complainant receives the natural and undiminished flow of the stream at all seasons of the year. This is what the complainant is entitled to. It appears that the complainant has not been at all times receiving the quantity of water

to which it is entitled.   Whatever the defendant is doing, which deprives the complainant of its rights, the complainant is entitled to have prevented by injunction.   The evidence is not in such shape as to enable us to settle upon the form of decree and injunction to which the complainant is entitled.   It may be that additional testimony will be required to be taken before a final decree and injunction, which will accurately settle the rights of the parties, can be drafted.

The decree of the court of chancery is reversed.   The case will be remanded to that court for the purpose of determining the proper form of decree and injunction to be made in conformity with the views herein expressed.

*For affirmance*—None.

*For reversal*—THE CHIEF-JUSTICE, TRENCHARD, PARKER, MINTURN, KALISCH, BLACK, KATZENBACH, CAMPBELL, LLOYD, WHITE, GARDNER, VAN BUSKIRK, MCGLENNON, KAYS, HETFIELD, JJ.   15.