Complainants, owners of lands in the township of Millburn, through which a natural water course flows, seek relief *Page 292 
by mandatory injunction against the defendant Charles S. Orben as owner of lands above those of complainants, charging that said defendant, by building upon, grading and developing his lands, including the laying out of streets and the construction of a drainage system, has concentrated and diverted surface waters from his lands and emptied them into the water course above the lands of the complainants by reason whereof in times of much precipitation, an excessive quantity of water is caused to flow into and through said water course, causing damage to complainants' lands.
Subsequent to the commencement of this suit, complainants obtained leave to join as a co-defendant the township of Millburn because of the acceptance by it of the streets laid out by Orben, in which acceptance was included the drainage system complained of, which, since its acceptance is being maintained by that municipality.
The surface of the lands in and about the premises of complainants and defendant Orben is such as necessarily collects large quantities of water after heavy rain and melting snow, which water is regularly discharged through a well defined water course, which the force of the water has made for itself, and through which it flows through the lands of complainants and defendant and finally discharges into a pond known as "Upper Pond" jointly owned by complainants and another. The pond covers one-third of an acre in area and is also fed by a northwesterly flow of water from a spring-fed stream.
The defendant Orben developed his land, and in 1919 laid out, constructed and paved a street known as Park road. In 1930 another street known as Park Circle was constructed and paved by him. In both streets the defendant constructed cement gutters and catch basins with feeders which drain adjacent land, and the eaves, cellar drains and rainspouts of the dwellings later erected by him. Tile pipes connected to the catch basins discharge the surface waters therein collected into the water course at a point where it flows underneath Park road.
Complainants charge that having thus improved his land, the defendant covered a large area of the earth's surface and thereby greatly decreased the natural seepage; obstructed *Page 293 
the natural flow and general spread of the surface waters; changed "the contour of terrain and water shed so as to increase the flow of rain and surface waters to said watercourse" to such an extent as to cause it to overflow and damage the lands of complainants, pollute the "Upper Pond" and injure the fish and game therein.
Complainants are entitled to the usual and accustomed flow of the water. Merritt v. Parker, 1 N.J. Law 526. And it is the right of every owner of land upon a stream to have the water come to him in its natural flow, undiminished in quantity, and, unimpaired in quality, and, it may be added, with no increase of the volume except from natural causes. Therefore it is an actionable nuisance at common law for a mill owner or other person to turn a new stream into the stream, or, by means of a reservoir, to increase the volume of water naturally flowing in the stream. East Jersey Water Co. v. Bigelow, 60 N.J. Law 201;Cozy Lake, Inc., v. Nyoda Girls' Camp, Inc., 99 N.J. Eq. 384.
The issue here is whether the defendant Orben possessed the right to drain by artificial means the surface water falling upon his lands and cast the same into the water course through which the surface waters prior to the improvement of his land drained.
It has been generally held, "that the owner of land has the right to collect the surface water and the natural drainage of his land into ditches, drains, or artificial streams and discharge it into a natural watercourse on his own land, which is the natural outlet of the waters so collected, and is not liable to lower proprietors although, by this arrangement, the flow of the waters is accelerated and increased, provided the discharge is not beyond the natural capacity of the water course, * * *."67 C.J. 879.
"It seems to be the well established rule that the owner of lands through which a natural water course flows may accumulate surface water falling upon lands adjacent thereto, and cast the same into such stream, without liability to a lower riparian owner for damages, although the flow of the waters is thereby accelerated and the volume increased, provided that this is done in the reasonable use of his own land, and that *Page 294 
the natural capacity of the stream is not so exceeded asmaterially to injure the lower proprietor. It has been held, however, that an owner of property may not drain, into a stream, surface water which would not otherwise flow in that direction, * * *. The weight of authority is, however, apparently to the effect that the same right of drainage exists in the case of natural depressions or drainways through which the surface water on the higher land drains onto the lower land, and that the flow of surface water along such depressions or drainways may be hastened and incidentally increased by artificial means so long as the water is not diverted from its natural flow. In other words, causing surface water to flow in its natural direction through a ditch on one's own land, instead of over the surface or by percolation as formerly, where no new watershed is tapped by said ditch and no addition to the former volume of surface water is caused thereby, except the mere carrying in a ditch what formerly reached the same point on defendant's land over a wider surface by percolation through the soil or by flowing over such wider surface, is not, when not negligently done, a wrongful or an unlawful act." 27 R.C.L. 1157 § 81. (Italics mine.)
The use to which defendant put his land by laying out and paving streets and erecting dwellings thereon was not unreasonable. Bowlsby v. Speer, 31 N.J. Law 351; Jessup v.Bamford Brothers Silk Manufacturing Co., 66 N.J. Law 641. But the testimony establishes the fact that the volume and velocity of the water flowing into the water course was so materially increased by the installation of the artificial drainage system that it caused damage to the lower proprietors. And this is logically inferable. The pavements, gutters, curbs, sidewalks and dwellings covering as they did a large area of the earth's surface, naturally had the effect of decreasing the natural absorption, seepage and percolation, thus increasing the volume and hastening the flow of the water.
The proofs disclose that prior to 1930 the banks of the "Upper Pond" did not overflow. After 1930 the water overflowed the southern boundary of the pond and complainant Boots said, "it gouged a great hole in the side bank of the *Page 295 
pond on its way — on its short cut from the center of the pond here [indicating] to this stream and it took about six truckloads of earth to refill that. At the same time it gouged at this side of the stream, rolled the bowlders for the first time down into the stream bed and it took another six loads of great bowlders, weighing several hundred pounds, to repair that damage. That was the first time within my occupancy of the property that the pond had overflowed and the first time that the stream had been gouged out."
Doctor Lowndes, another of the complainants, testified that the water "washed down over our property and carried the silt and it has washed the stone in the driveway out; it has filled the ravine, the lower end of the ravine a foot and a half or two feet in muck. We have had that taken out once or twice a year, and it fills up again. It was not that way, before." He says the washing down of the silt and dirt discolored the pond "from about the bridge, that is the outlet of the lake, up to the mouth of the stream where the silt and mud was deposited."
I am satisfied from the evidence that what the defendant did by way of artificially draining his lands resulted in materially increasing the volume so as to exceed the natural capacity of the stream to the injury of complainants, the lower proprietors.
Upon the hearing it appeared that there is a township storm sewer which terminates at a point in Park road some three or four hundred feet distant from the point where defendant's drainage system empties into the water course.
I am of the opinion that the complainants are entitled to an injunction. The defendant Orben upon signifying his intention and willingness within ten days to make application to the municipal authorities to connect his drainage system with the storm sewer in Park road and to proceed with the construction work with all convenient speed will be afforded reasonable opportunity to do so. In the interim injunction will be withheld.
The defendant township of Millburn filed counter-claim in which it prays that in the event defendant Orben is found by the court to have created the nuisance complained of, he having *Page 296 
conveyed the premises to the defendant municipality with the original wrong existing, the defendant be treated as affirming its continuance because of his covenant in his deed contained for quiet enjoyment by the municipality of the premises containing the nuisance. The principle seems to be clear that one who erects a structure or construction which creates a nuisance, and then conveys to another his title, with covenants with the grantee for quiet enjoyment and the right to maintain the erection, is liable for its continuance upon the ground that by his relations with the occupier he affirms the nuisance, and must be regarded in law as continuing it. The ground upon which the alienor is held liable for a nuisance created by him is that he is the author of the original wrong, and transferring the premises with the original wrong still existing is treated as affirming the continuance of it. East Jersey Water Co. v. Bigelow, supra.