[Sac. No. 4757. In Bank.—February 28, 1935.]

ELGE MASTRANGELO, a Minor, etc., Appellant, v. WEST SIDE UNION HIGH SCHOOL DISTRICT, OF MERCED COUNTY, STATE OF CALIFORNIA (a Body Corporate and Politic), et al., Respondents.

P. A. MASTRANGELO et al., Appellants, v. WEST SIDE UNION HIGH SCHOOL DISTRICT, OF MERCED COUNTY, STATE OF CALIFORNIA (a Body Corporate and Politic), et al., Respondents.

Andrew R. Schottky and H. K. Landram for Appellants.

F. M. Ostrander for Respondents.

THE COURT.—A hearing was granted in this case after decision by the District Court of Appeal, Third Appellate

District. Upon further consideration, we adopt the opinion of Mr. Justice Thompson as part of the opinion of this court. It reads as follows:

"The plaintiffs have appealed from a nonsuit which was granted upon the completion of their evidence at the trial of suits for damages for personal injuries sustained as a result of alleged negligence.

"The above-entitled causes were consolidated for the purpose of trial. The appeals in both cases are determined by the same facts and law. To avoid confusion reference will be made only to the first above-entitled cause. For convenience the defendants will be hereinafter referred to as the defendant.

"The defendant Union High School District of Merced County is organized under the provisions of law. The course of instruction includes the teaching of elementary chemistry. For the purpose of teaching chemistry, a laboratory was provided with appropriate equipment, including chemical substances with which to perform the standard experiments prescribed by the textbooks. Among the equipment of the laboratory which was provided by the school for that purpose was a sink, benches, a cabinet containing various ingredients used for experiments, and an iron mortar and pestle. The experiments were presumed to be supervised by the teacher of chemistry. Greer and Bennett's Elementary Chemistry was used as a textbook on that subject. Among the experiments which were required in that course was the compounding of certain explosives. This experiment was designated as No. 40. It described the process of making ordinary gunpowder. After a general recital of the component parts to be used for compounding solid explosives, and the effect of oxygen and heat upon them, the following instructions were given for performing the experiment:

" '(a) Put a little sulphur on a sheet of paper on your desk. Powder it very thoroughly by using a dry bottle as a rolling pin. Describe the solid. Much of the success of the experiment depends on the thoroughness with which the substance is powdered.

" '(b) On another piece of paper, put an equal bulk of wood charcoal. Powder it also. Describe the solid.

" '(c) On a third piece of paper put twice as much potassium nitrate as you have sulphur. Pulverize this. Describe the solid.

" '(d) Now mix the contents of papers used in (a) and (b) by pouring the powders back and forth from one paper to the other at least a dozen times. Thorough mixing is necessary to make this a successful explosive. Now, pour this mixture on the paper in (c) and mix these substances as you did the first ones. What is the color of the mixture now?

" '(e) This mixture is composed of the same ingredients as gunpowder. Make a little heap of it on a stone table top, or a brick or an iron pan. Lay the Bunsen burner on its side so that the flame plays on the edge of the pile of powder. Stand back. What takes place? What odor do you notice?

. . . . . . . . . . . . .

" 'From this experiment, we see that solids may explode. Solid substances will not generally explode, however, unless they are (1) in very finely powdered form, and (2) mixed with oxygen, air, or an oxygen compound which gives up its oxygen readily when heated.

" '¹The oxygen compound commonly used in gunpowder is niter or saltpeter; its chemical name is potassium nitrate; its formula is $KNO_3$.'

"The plaintiff, Elge Mastrangelo, was a boy of good intelligence. He was sixteen years of age when the accident which is involved in this suit occurred. He had attained the grade of a junior in the high school. He was a member of the chemistry class and had just commenced his laboratory work in company with other students under the supervision of Mr. Williams, the chemistry teacher. Various ingredients used for performing the required experiments, such as charcoal, sulphur, potassium nitrate and potassium chlorate, were kept in the laboratory in a cabinet or on a shelf in small pasteboard boxes. The plaintiff, in company with two other students, had twice previously performed the gunpowder experiment. In the laboratory, under the supervision of the chemistry teacher, on October 27, 1930, Elge was attempting to repeat the same experiment for the third time. Instead of pulverizing the ingredients upon separate sheets of paper as directed by the textbook, they were mixed

together and ground in an iron mortar by means of a pestle. Instead of using potassium nitrate as directed by the textbook, either by mistake or otherwise, potassium chlorate was substituted therefor, or both substances were used. Both of these ingredients were kept in similar separate boxes on the shelf directly in front of the bench where the students were performing the experiment. While the plaintiff was mixing the ingredients an explosion occurred which blew off his left hand and seriously injured his right hand. His right eye was completely destroyed, and his left eye was injured. He is now scarcely able to read or see. He was compelled to procure a glass eye to replace his destroyed right eye. His injuries are serious and permanent.

"Suit for damages for personal injuries sustained as a result of alleged negligence in failing to properly instruct or supervise the performance of highly dangerous experiments on the part of the students, was commenced. Upon trial of the cause before a jury, at the close of the testimony which was adduced on behalf of the plaintiffs, a nonsuit was granted. From this nonsuit the plaintiffs have appealed. They contend the record discloses ample evidence of negligence proximately causing the accident, which required the submission of the facts to the jury.

"We are of the opinion the evidence is adequate to have required the submission of the cause to the jury for its determination of the facts, and that the nonsuit was therefore erroneously granted.

"The theory of the law is that a complainant has a right to have every material issue of fact, arising in a suit based upon negligence, determined by the jury. A motion for nonsuit should not be granted except when it clearly appears there is no material issue left for the decision of the jury. A nonsuit should be granted only when, accepting the full force of the evidence adduced, together with every reasonable inference favorable to the plaintiff, which may be drawn therefrom, and excluding all evidence in conflict therewith, it still appears that the law precludes the plaintiff from recovering a judgment under such circumstances.

A multitude of authorities has uniformly held the following principles to apply to a motion for nonsuit. The evidence must be construed most strongly against the defendant. Every favorable inference and presumption which

may be fairly deduced from the evidence should be resolved in favor of the plaintiff. The plaintiff's evidence must ordinarily be accepted as true, and evidence which is contradictory thereof should be disregarded. Upon a motion for non-suit the credibility of witnesses is ordinarily not involved. (9 Cal. Jur., p. 551, sec. 35.)

■ "Applying the foregoing rules to the record in the present case, it may be reasonably inferred there is substantial evidence to indicate that the defendant was guilty of negligence in failing to exercise reasonable care in providing and labeling dangerous materials to be used in chemical experiments, and in failing to properly instruct and supervise the selection, compounding and handling of dangerous ingredients used in manufacturing explosives. It is not unreasonable to assume that it is the duty of a teacher of chemistry, in the exercise of ordinary care, to instruct students regarding the selection, mingling and use of ingredients with which dangerous experiments are to be accomplished, rather than to merely hand them a textbook with general instructions to follow the text. This would seem to be particularly true when young and inexperienced students are expected to select from similar containers a proper harmless substance rather than another dangerous one which is very similar in appearance. ■ It is the province of the jury to determine whether the mixing of the ingredients which were used to compound gunpowder in a mortar by means of a pestle, increase the danger of an explosion; whether the plaintiff was without previous knowledge or instruction regarding that danger, and whether that process was knowingly permitted to be followed by the pupil without warning from the teacher. It may also be a proper question for the determination of the jury as to whether the delivery of a textbook to an inexperienced pupil with mere instructions to follow the text, in the performance of a dangerous experiment in chemistry, is a sufficient exercise of care. In other words, if the jury should find that it was highly dangerous to mix together potassium chlorate, charcoal and sulphur in an iron mortar by means of a pestle; it would become a further question of fact for the jury to determine whether the teacher was negligent in failing to warn the pupil of that danger, particularly if he

observed the boy following that method and knew that he was inexperienced in that science.

■ "It is true that the burden is on the plaintiff to establish a *prima facie* showing of negligence against the defendant, and if he fails to do so, that a nonsuit may be properly granted. To justify the denying of a nonsuit it is necessary only that a *prima facie* case of negligence be shown, from which the jury may reasonably infer that the defendant was guilty of negligence, or that the teacher was under a legal duty to warn and protect the plaintiff against the injury which he received. (19 Cal. Jur., p. 739, sec. 142.) Ordinarily the presence of both negligence and contributory negligence are questions for the determination of the jury. (19 Cal. Jur., p. 719, sec. 133; Id., p. 742, secs. 141–143.) ■ Under the circumstances of this case, we are of the opinion both of these questions should have been submitted to the jury. Regarding the question of contributory negligence, upon which the respondent relies, the fact that the ingredients which were used in manufacturing gunpowder were mixed together by the plaintiff in a mortar instead of pulverizing them separately on sheets of paper as directed by the textbook presents a proper question regarding the presence of contributory negligence for the jury to determine, in view of the age and inexperience of the student, especially since neither the textbook nor the teacher warned him against mixing the ingredients in that manner. There is evidence that he was ignorant of the dangerous character of this experiment. The plaintiff's alleged contributory negligence was therefore a proper question to be submitted to the jury.

"The evidence shows that Mr. Williams, the chemistry teacher, was present in the laboratory during the experiment which resulted in the explosion; that he stood immediately behind the plaintiff and saw or may have seen not only the selection of the ingredients, but the fact that they were being mixed together in the iron mortar instead of pulverizing them separately on sheets of paper as directed by the textbook, and that he failed to warn the student of the danger of that method. The plaintiff testified in that regard: 'Q. Do you know whether or not Mr. Williams was in the room at any time during the time that you were doing the experiment upon the day of the explosion? A.

Yes sir. He was there. . . . When I and Angelo were mixing this ingredient, he just walked behind us. . . . Q. At the time that you and Angelo were mixing these ingredients, Mr. Williams walked by you? A. Yes sir. . . . We just had thrown them in . . . In that iron mortar. Q. You say he didn't say anything to you? A. No sir. Q. Do you know where Mr. Williams was at the time of the explosion? A. Yes sir. Q. Where? A. Well, he was about 15 feet behind me. . . . He was looking right towards me.'

"From the foregoing evidence a reasonable inference may be drawn that the chemistry instructor saw the grinding of the ingredients in the iron mortar with the pestle, yet he failed to warn the boys against the danger of that method of mixing them. He knew the boys were then compounding the materials for the experiment of manufacturing gunpowder. The plaintiff testified that just before they began the experiment he 'went up to Mr. Williams' and said 'I and Angelo are going to make that gunpowder experiment'. The instructor consented to their doing so.

"The plaintiff testified that he did not know the difference between potassium nitrate and potassium chlorate; that they looked the same to him. They were kept in similar boxes on a shelf near the mortar where they were mixing the ingredients. Regarding his ignorance of the difference between these elements, and a lack of instruction in that regard, the plaintiff testified: 'Q. Do you know the difference between those two matters? A. No sir. Q. Had Mr. Williams or anyone else in authority in the school ever told you that it was dangerous to use potassium chlorate in the performing of the explosion or gunpowder experiment? A. No sir. Q. Had Mr. Williams or anyone else in authority of the school ever told you it was dangerous to grind sulphur, carbon and potassium chlorate or potassium nitrate together in that iron mortar? A. No sir. . . . Q. Had Mr. Williams or anyone else in authority ever warned you against using potassium chlorate in the performance of this experiment 40 or the making of an explosive? A. No sir. Q. Had Mr. Williams or anyone else in authority ever warned you that it was dangerous to mix these various ingredients together . . . in the mortar . . . by pounding or working it around? A. No. sir. . . . The second time that you did this experiment . . . was Mr. Williams present at

that time? A. Yes sir. Q. And he did not at that time or afterwards discuss the experiment with you? A. No sir.'

"In support of his claim that he did not know the difference in appearance between potassium nitrate and potassium chlorate, the plaintiff said: 'Q. Do you know what the other one was? A. They both look alike. . . . Q. You mean you don't know what the fourth ingredient was? A. No, I don't remember. They both,—chlorate and nitrate, as I know them, both look alike.'

"The plaintiff used the same ingredients at the time of the explosion which he had previously used. He testified in that regard: 'Q. Why did you use potassium chlorate? A. That is what I used before. Q. The book called for potassium nitrate? A. Yes sir. . . . I didn't know it at the time, though. . . . Q. The materials were kept in that cabinet, weren't they? A. No sir. Q. As a rule? A. No sir. Q. Did you observe or have handed you a paper apparently mimeographed, entitled "Rules for Conduct in the Chemical Laboratory"? A. No sir. Q. Did you see on the wall such a paper? A. No sir. Q. You knew that you were supposed to ask for ingredients? A. No sir. Q. Before you get them, didn't you? A. No sir. Q. You did not? A. No sir.'

"The respondent argues that the plaintiff recklessly experimented with the dangerous ingredients with knowledge of that danger, just to get the thrill from an explosion. Fairly considered, we think the evidence discloses no previous knowledge on his part of the identity or danger of using potassium chlorate, or of mixing together in an iron mortar the ingredients for compounding gunpowder. The reasonable inference secured from the record is that the plaintiff was mixing the gunpowder ingredients for the very purpose of obtaining an explosion, which is the result of which the textbook experiment is intended. The text reads: 'From this experiment we may see that solids may explode.' The plaintiff testified in that regard: 'Q. As a matter of fact you were performing this experiment to get a kick out of the explosion, weren't you? . . . A. No, I was not. Q. What? A. No, sir. Q. What was your purpose? A. Well, to make a pop out of it. Q. To make a pop out of it? A. Sure. Q. You wanted to see it go off, is that right? A. Yes sir. Q. And you and Angelo Marchese decided be-

cause it hadn't popped sufficiently on another occasion that you would add a little something to it to see if you couldn't get a bigger pop, didn't you? A. No sir. Q. What? A. No sir. Q. Well, why did you use potassium chlorate? A. That is what I used before. . . . Q. Then, on each occasion, you used the potassium chlorate out of this particular container? A. Yes sir.' ''

It is the contention of defendants and respondents that the conclusion reached above is in conflict with the decisions of this court in *Studer* v. *Southern Pac. Co.*, 121 Cal. 400 [53 Pac. 942, 66 Am. St. Rep. 39], *Wallace* v. *Great Western Power Co.*, 204 Cal. 15 [266 Pac. 281], and *Bolar* v. *Maxwell Hardware Co.*, 205 Cal. 396 [271 Pac. 97, 60 A. L. R. 429]. In the Studer case a twelve year old boy sought to cross a street by climbing over the coupling of two cars, and was crushed to death. In the Wallace case, a boy of about the same age climbed an electric tower and was electrocuted by a high voltage cable. In the Bolar case, a fifteen year old boy purchased gunpowder at the defendant's store, and constructed a ''cannon'', which he loaded and discharged, the resulting explosion injuring him severely. In each of the above cases it was held that the child was of sufficient age to be charged with contributory negligence in his actions. It is at once obvious that these decisions are completely distinguishable from the instant case in an important particular, namely, that they all involve voluntary acts by the children concerned. In the instant case, the particular experiment was prescribed as part of the course and the plaintiff was instructed to perform it. It is not a case, therefore, of ''the whole plan originating in his own mind'', and ''carried out secretly'' with knowledge that he would be forbidden to put it into execution if discovered, as held in the Bolar case, *supra*. On the contrary, the experiment was required and was conducted openly in full view of the instructor.

It may well be doubted whether it is proper in an introductory school course in chemistry to require pupils to make and ignite an explosive. It would appear that the dangers of such an experiment, incorrectly performed by young children, might be anticipated; and that the benefits to be derived from its actual performance by each pupil are not so great as to justify the risk of serious injury to the child. But at the very least, if it is to be performed, it necessarily

requires the strictest personal attention and supervision of the instructor. We have no sympathy with the defense that the book called for certain ingredients, and that "the idea of putting in some other ingredients was out of his (the plaintiff's) own mind".

The judgment is reversed.

Rehearing denied.