[L. A. No. 17613. In Bank. Nov. 14, 1941.]

AGATHA ARCHER et al., Appellants, v. CITY OF LOS ANGELES (a Municipal Corporation) et al., Respondents.

[L. A. No. 17612. In Bank. Nov. 14, 1941.]

JAMES L. ALLISON et al., Appellants, v. CITY OF LOS ANGELES (a Municipal Corporation) et al., Respondents.

Dempster & Dempster, Grace Dempster, J. H. Creighton and Jerrell Babb for Appellants.

Hibbard & Kleindienst, Hill, Morgan & Bledsoe, Charles P. McCarthy, Julius V. Patrosso, Earle M. Daniels, Bartlett & Kearney, Harry J. McClean, Irsfeld & Irsfeld, Latham & Watkins, Freston & Files, Chase, Barnes & Chase and Henry M. Lee, as *Amici Curiae,* on behalf of Appellants.

Everett W. Mattoon and J. H. O'Connor, County Counsel, S. V. O. Prichard, Assistant County Counsel, J. H. Moroney, Deputy County Counsel, Ray L. Chesebro, City Attorney,

Frederick von Schrader and Leon T. David, Assistants City Attorney, and Howard E. Crandall and Henry C. Ramsey, Deputies City Attorney, for Respondents.

TRAYNOR, J.—Plaintiffs own land in Venice, a suburb of the city of Los Angeles. The land is located near La Ballona Lagoon, a body of water about two miles long and two miles wide, which empties into the Pacific Ocean and is fed by La Ballona Creek, a natural watercourse draining an area of about 134 square miles. A map of the area as it existed in 1893 shows that the waters descending from the hills followed no defined course until they reached lower La Ballona Creek. In the ensuing years, however, the area drained by the creek and its tributaries was transformed into residential and business districts and the waters were gradually confined to ditches and channels emptying into the creek. The city of Los Angeles, the Los Angeles County Flood Control District, and the county of Los Angeles, acting independently, straightened, widened, and deepened the creek and its tributaries and constructed concrete storm drains to improve the drainage. The urbanization of the area resulted in less absorption of water into the earth, while the improved drainage accelerated the flow of water into the lagoon. The outlet from the lagoon into the ocean, however, was in no way improved to accommodate the increased flow of water but remained in its natural state. Meanwhile several bridges were constructed across the lagoon.

Throughout December 31, 1933, and January 1, 1934, a heavy rainstorm occurred. The waters swept down La Ballona Creek and into the lagoon where, because of the inadequate outlet, they overflowed on to plaintiffs' properties, flooding them to a depth of from six to eight feet for about four days.

The plaintiffs thereupon brought these actions for damages against the city, the county, and the flood control district. They claim the right to recover from defendants under article I, section 14 of the California Constitution which requires the payment of just compensation for private property taken or damaged for public use. The complaints allege that defendants acted negligently in constructing a drainage system with an inadequate outlet, improperly permitted obstructions in the lagoon, diverted water from streets within the drainage

area on to plaintiffs' properties, and damaged plaintiffs' property for a public use without making compensation.

A demurrer of the defendant flood control district to one of the complaints was sustained without leave to amend, but on appeal the District Court of Appeal reversed the judgment, holding that the complaint stated a good cause of action. (*Archer* v. *City of Los Angeles,* 15 Cal. App. (2d) 520 [59 Pac. (2d) 605].) The actions were then consolidated for trial. At the conclusion of plaintiffs' evidence, the trial court entered judgments of nonsuit in favor of defendants, and plaintiffs have appealed.

██ It is settled that "A nonsuit should be granted only when, accepting the full force of the evidence adduced, together with every reasonable inference favorable to the plaintiff, which may be drawn therefrom, and excluding all evidence in conflict therewith, it still appears that the law precludes the plaintiff from recovering a judgment. . . . " (*Mastrangelo* v. *West Side U. H. School Dist.,* 2 Cal. (2d) 540, 544 [42 Pac. (2d) 634] ; *Angelus Sec. Corp.* v. *Ball,* 20 Cal. App. (2d) 423, 435 [67 Pac. (2d) 152].) Plaintiffs have established by their evidence that defendants straightened and widened the channel of La Ballona Creek and constructed concrete storm drains that followed the natural drainage of the country ; that these improvements accelerated the flow of the water ; that the outlet into the ocean remained unimproved and could not accommodate the increased flow ; that the defendants had knowledge of the inadequacy of the outlet ; that in the opinion of two experts such a drainage system was "not good engineering"; and that the flow of water was obstructed by several bridges across the lagoon including one constructed by the city.

The question presented is whether a governmental agency is liable under article I, section 14, for damaging property for a public use when improvements constructed by it along the natural course of a stream and its tributaries accelerate the flow of the water, and lower lands are flooded because of the inadequacy, known to the agency, of the outlet to accommodate the increased flow.

██ The state or its subdivisions may take or damage private property without compensation if such action is essential to safeguard public health, safety, or morals. (*Gray* v.

*Reclamation Dist.*, 174 Cal. 622 [163 Pac. 1024] at 640; *Bowditch* v. *Boston,* 101 U. S. 16 [25 L. Ed. 980]; *Chicago B. & Q. R. R. Co.* v. *Illinois,* 200 U. S. 561 [26 Sup. Ct. 341, 50 L. Ed. 596]; *Omnia Commercial Co.* v. *United States,* 261 U. S. 502 [43 Sup. Ct. 437, 67 L. Ed. 773]; see cases cited 5 Cal. Jur. 696 et seq.) In certain circumstances, however, the taking or damaging of private property for such a purpose is not prompted by so great a necessity as to be justified without proper compensation to the owner. (*Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393 [43 Sup. Ct. 158, 67 L. Ed. 322]; *Chicago B. & Q. R. R. Co.* v. *Chicago,* 166 U. S. 226 [17 Sup. Ct. 581, 41 L. Ed. 979]; see cases cited in 10 Cal. Jur. 283, 284, 295.) ■ The liability of the state under article I, section 14 of the California Constitution arises when the taking or damaging of private property is not so essential to the general welfare as to be sanctioned under the "police power" (*Pennsylvania Coal Co.* v. *Mahon, supra; Chicago B. & Q. R. R. Co.* v. *Chicago, supra;* 10 Cal. Jur., *supra;* see *Mugler* v. *Kansas,* 123 U. S. 623 [8 Sup. Ct. 273, 31 L. Ed. 205]), and the injury is one that would give rise to a cause of action on the part of the owner independently of the constitutional provision. (*Lamb* v. *Reclamation Dist.,* 73 Cal. 125, 129–131 [14 Pac. 625, 2 Am. St. Rep. 775]; *San Gabriel Valley Country Club* v. *County of Los Angeles,* 182 Cal. 392 [188 Pac. 554, 9 A. L. R. 1200]; *Jefferson County Drainage Dist.* v. *McFaddin,* (Tex. Civ. App.) 291 S. W. 322.) ■ The provision permits an action against the state, which cannot be sued without its consent. It is designed, not to create new causes of action, but to give a remedy for a cause of action that would otherwise exist. The state is therefore not liable under this provision for an injury that is *damnum absque injuria.* If the property owner would have no cause of action were a private person to inflict the damage, he can have no claim for compensation from the state. (*Lamb* v. *Reclamation Dist., supra,* 129–131; *San Gabriel Valley Country Club* v. *County of Los Angeles, supra; Jefferson County Drainage Dist.* v. *McFaddin, supra.*) In the present case, therefore, plaintiffs have no right to compensation under article I, section 14, if the injury is one that a private party would have the right to inflict without incurring liability.

■ It is established in California and other jurisdictions that a lower owner has no right of redress for injury to

his land caused by improvements made in the stream for the purpose of draining or protecting the land above, even though the channel is inadequate to accommodate the increased flow of water resulting from the improvements. (*San Gabriel Valley Country Club* v. *County of Los Angeles, supra; Board of Drainage Com'rs.* v. *Board of Drainage Com'rs.,* 130 Miss. 764 [95 So. 75, 28 A. L. R. 1250]; *Mizell* v. *McGowan,* 129 N. C. 93 [39 S. E. 729, 85 Am. St. Rep. 705]; *O'Donnell* v. *City of Syracuse,* 184 N. Y. 1 [76 N. E. 738, 112 Am. St. Rep. 558, 3 L. R. A. (N. S.) 1053]; *City of Hamilton* v. *Ashbrook,* 62 Ohio 511 [57 N. E. 239]; *Lessenger* v. *City of Harlan,* 184 Iowa 172 [168 N. W. 803, 5 A. L. R. 1523]; *Strauss* v. *Allentown,* 215 Pa. 96 [63 Atl. 1073, 7 Ann. Cas. 686]; *Peck* v. *Herrington,* 109 Ill. 611, 50 Am. Rep. 627]; *Jefferson County Drainage Dist.* v. *McFaddin, supra; City of Ludlow* v. *Broderick,* 181 Ky. 123 [203 S. W. 1082]; *Manteufel* v. *Wetzel,* 133 Wis. 619 [114 N. W. 91, 19 L. R. A. (N. S.) 167]; *Trigg* v. *Timmerman,* 90 Wash. 678 [156 Pac. 846, L. R. A. 1916F, 424]; *Robb* v. *Village of La Grange,* 158 Ill. 21 [42 N. E. 77].) In the San Gabriel Valley Country Club case Los Angeles County constructed concrete storm drains that followed the natural drainage of the country, accelerated the flow of water, and prevented its absorption by adjoining lands. As a result plaintiff's land, situated below the point where the drains emptied into the stream, was damaged during a heavy rain storm. In holding that plaintiff had no right of recovery against the county this court stated (at page 406): " . . . an improvement for the purposes of the drainage and protection of lands above does not give a lower riparian owner on the stream a cause of action merely because such improvement increases the volume of water in the stream as it comes to his land, even though the burden he is necessarily under of protecting his land against the stream is thereby increased and his land is injured because of his failure to meet such increased burden; . . . the rule is not subject to the limitation that the increased volume must not be such as to make the stream exceed the capacity of its channel."

Accordingly, the construction of the improvements by the defendants in the instant case did not place upon them the duty of improving the outlet. They cannot be held negligent for doing what they had a right to do even though a

different plan might have avoided the damage. (*Board of Drainage Com'rs.* v. *Board of Drainage Com'rs., supra,* at 81; *Dudley* v. *Village of Buffalo,* 73 Minn. 347 [76 N. W. 44, 45]; *Hamilton* v. *Ashbrook, supra,* at 241; *Lessenger* v. *City of Harlan, supra,* at 805.)

█ The improvements must follow the natural drainage of the country. If the water is diverted out of its natural channel and discharged into a different channel or upon neighboring land, the diverter is liable to the owner whose land is injured by such discharge. (*Shaw* v. *Sebastopol,* 159 Cal. 623 [115 Pac. 213]; *Stanford* v. *San Francisco,* 111 Cal. 198 [43 Pac. 605]; *Farrell* v. *City of Ontario,* 39 Cal. App. 351 [178 Pac. 740], 36 Cal. App. 754 [173 Pac. 392]; *Dick* v. *City of Los Angeles,* 34 Cal. App. 724 [168 Pac. 703]; *Mulder* v. *City of Los Angeles,* 110 Cal. App. 663 [294 Pac. 485]; *Newman* v. *City of Alhambra,* 179 Cal. 42 [175 Pac. 414]; see 11 Cal. L. Rev. 444.) █ In the present case, however, there is no evidence of diversion. Straightening, widening, or deepening the channel of a stream to improve the drainage entails no diversion of the waters therein. (*San Gabriel Valley Country Club* v. *County of Los Angeles, supra; Lambert* v. *Alcorn,* 144 Ill. 313 [33 N. E. 53, 21 L. R. A. 611]; *Gentry* v. *Weaver,* 130 Kan. 691 [288 Pac. 745]; *St. Paul & D. R. Co.* v. *Duluth,* 56 Minn. 494 [58 N. W. 159, 45 Am. St. Rep. 491, 23 L. R. A. 88]; *Fenton* v. *Adams,* 221 Ill. 201 [77 N. E. 531, 112 Am. St. Rep. 171]; see 67 C. J. 902.) █ Likewise there is no diversion if surface waters, flowing in no defined channel, are for a reasonable purpose gathered together and discharged into the stream that is their natural means of drainage even though the stream channel is inadequate to accommodate the increased flow. (*San Gabriel Valley Country Club* v. *County of Los Angeles supra,* 401, 402; *Sheehan* v. *Flynn,* 59 Minn. 436 [61 N. W. 462, 26 L. R. A. 632]; *Board of Drainage Com'rs.* v. *Board of Drainage Com'rs., supra; Mizell* v. *McGowan, supra; Dudley* v. *Village of Buffalo, supra; Waffle* v. *New York Central R. R. Co.,* 53 N. Y. 11 [13 Am. Rep. 467]; *St. Paul & D. R. Co.* v. *Duluth, supra; City of Hamilton* v. *Ashbrook, supra; Lessenger* v. *City of Harlan, supra; Peck* v. *Herrington, supra; Jefferson County Drainage Dist.* v. *McFaddin, supra; Manteufel* v. *Wetzel, supra;* see *Robb* v. *Village of La Grange, supra; O'Donnell* v. *City of Syracuse,*

*supra; City of Maysville* v. *Brooks,* 145 Ky. 526 [140 S. W. 665] ; see cases cited in 85 Am. St. Rep. 733, 734.) ▉

A California landowner may not collect such waters and discharge them upon adjacent land (*LeBrun* v. *Richards,* 210 Cal. 308 [291 Pac. 825, 72 A. L. R. 336]), but he may discharge them for a reasonable purpose into the stream into which they naturally drain without incurring liability for damage to lower land caused by the increased flow of the stream. As stated in *San Gabriel Valley Country Club* v. *County of Los Angeles, supra,* at pages 401, 402: "Not to permit an upper land owner to protect his land against the stream would be in many instances to destroy the possibility of making the land available for improvement or settlement and condemn it to sterility and vacancy. Such a rule would seriously interfere with the development of the country. Because of this, and because of the necessity of permitting the utilization for drainage of the means afforded by nature for the purpose, a very great preponderance of the decisions in other states go further than it is necessary to go in this case, and hold that a riparian owner has no right to complain because the volume of water in the stream is increased by artificially draining surface waters into it above, provided only the stream is the natural drainage channel for the lands so drained. Furthermore, this rule is adopted regardless of whether the so-called common-law rule concerning surface waters prevails in the particular jurisdiction or, as here, the civil-law rule, which forbids the gathering together of surface waters and discharging them as a stream upon adjoining lands. If the surface waters are gathered and discharged into the stream which is their natural means of drainage, so that they come to the land below only as a part of the stream, it is held that no action lies because of their being added. (Citing cases.) Mr. Freeman in his note in 85 Am. St. Rep. 727, reviews very thoroughly the authorities dealing with the right to accelerate or diminish the flow of water, and upon the particular point under discussion says (page 733): 'We have just noticed the difference between merely draining on to another's land, and draining into a natural channel or watercourse, which flows across such land. So far as streams or natural watercourses are concerned, there can be no doubt that one can drain into them, and thereby increase their volume without subjecting himself to

liability for any damage suffered by a lower owner.' '' The evidence here presented shows clearly that the storm drains constructed by defendants either followed the channel of natural streams (see *Larrabee* v. *Cloverdale,* 131 Cal. 96, 100 [63 Pac. 143]), or discharged into the creek surface waters that would naturally drain into it.

Any damage caused by an obstruction to the natural flow of waters is also actionable (*Richardson* v. *City of Eureka,* 96 Cal. 443 [31 Pac. 458]; *Dick* v. *City of Los Angeles, supra; Los Angeles Cemetery Ass'n* v. *Los Angeles,* 103 Cal. 461 [37 Pac. 375]; *Conniff* v. *San Francisco.* 67 Cal. 45 [7 Pac. 41]; *Larrabee* v. *Cloverdale, supra; Geurkink* v. *City of Petaluma,* 112 Cal. 306 [44 Pac. 570]), and plaintiffs contend that several bridges and other structures obstructed the flow of waters through the lagoon. Their evidence shows that only one bridge was constructed by defendants. The basis of liability must therefore depend upon this bridge. Plaintiffs' evidence establishes that this bridge caught debris swept down into the lagoon and obstructed to some extent the flow of the waters. The testimony of plaintiffs' own experts makes it clear, however, that the flooding of plaintiffs' land was caused by the inadequacy of the outlet and would have occurred regardless of the obstruction created by the bridge. Plaintiffs have made no showing that the obstruction of the bridge contributed to the damage caused by the overflow. No liability can be imposed upon defendants merely because the bulkheads supporting the banks on either side of the bridge might have prevented the water from forcibly widening the channel by washing away the banks; for it is firmly established that a riparian owner may erect bulkheads or other structures along the banks of a stream to protect his land from being washed away. (*Barnes* v. *Marshall,* 68 Cal. 569 [10 Pac. 115]; *Weinberg Co.* v. *Bixby,* 185 Cal. 87 [196 Pac. 25]; *Horton* v. *Goodenough,* 184 Cal. 451 [194 Pac. 34]; *De Baker* v. *Southern Cal. Ry. Co.,* 106 Cal. 257, 279, 280 [39 Pac. 610, 46 Am. St. Rep. 237]; *Lamb* v. *Reclamation Dist.,* 73 Cal. 125 [14 Pac. 625, 2 Am. St. Rep. 775]; *Sanguinetti* v. *Pock,* 136 Cal. 466 [69 Pac. 98, 89 Am. St. Rep. 169]; see cases cited in 25 Cal. Jur. 1051, 1052, sec. 47; 26 Cal. Jur. 290–292, secs. 503–508.) The evidence presented by the plaintiffs in the

instant case is therefore insufficient to establish a right to recover against the defendants.

Plaintiffs contend that the decision of the District Court of Appeal, holding that their complaint stated a good cause of action against a general demurrer, is the law of the case and requires this court to reverse the nonsuit of the trial court. The District Court of Appeal stated that "The gist of the . . . complaint . . . is that respondent constructed and built an artificial drainage system so defectively, carelessly and negligently that it would not carry the storm waters to the Pacific Ocean as designed and intended" and "that the injury to the appellants occurred by reason of the fact that respondent negligently turned the storm waters into La Ballona lagoon, which was too small to conduct the water turned into it by and through the drainage system constructed, operated and maintained by respondent. . . . '' According to the allegations of the complaint, the damage resulted because defendants negligently diverted water out of its natural channel, and obstructed the channel of the creek. Plaintiffs' evidence, however, fails to substantiate such allegations. The decision of the District Court of Appeal on demurrer is therefore not binding on this court in passing on the sufficiency of the evidence to support the allegations.

The judgment is affirmed.

Gibson, C. J., Shenk, J., and Edmonds, J., concurred.

CARTER, J.—I dissent.

The statement of facts in these cases contained in the majority opinion is both incomplete and inaccurate and the legal theory upon which the decision is based is manifestly unsound and unsupported by respectable authority. The principles of law, if they may be called such, announced in the majority opinion, are clearly contrary to the settled law of California and the weight of authority elsewhere.

Since a correct statement of the facts is essential to the proper determination of every law suit, I will first set forth the facts as they appear in the record before us in these cases.

Consolidated actions were brought to recover damages resulting from the overflow of storm waters upon the real prop-

erty of the plaintiffs and their assignors located in Venice, a suburb of the city of Los Angeles. At the close of plaintiffs' evidence, judgments of nonsuit were entered from which the plaintiffs have appealed.

The litigation concerns the drainage area of La Ballona Creek, approximately twelve miles square, located in the westerly part of Los Angeles County, and is bounded on the north by the Santa Monica Mountains and the Hollywood Hills, on the south by the Baldwin Hills, on the east by Vermont Avenue and on the west by Sepulveda Canyon and the Pacific Ocean. Within the above-mentioned area are situated the towns of Culver City, Beverly Hills and Palms, and a portion of the defendant city of Los Angeles. The entire area is a part of the defendant Los Angeles County Flood Control District.

It was agreed in the court below that the issue of liability or nonliability should be tried first. The evidence regarding the development and urbanization of the area, including changes in the methods of drainage, is voluminous and technical. Briefly, when the watershed was in its natural state much of the rain that fell into it never reached the outlet at La Ballona Lagoon, a large submerged area close to the Pacific Ocean which constituted its outlet. The drainage of the watershed extended over a wide area in "thin sheets," and much of the water was absorbed in the ground, lost by evaporation, or held by large lakes or swamps and slow-moving streams. The development of the area brought a gradual confinement of the drainage, and sections which had once been absorptive, came to have a run-off themselves. The defendant city constructed thirteen concrete storm drains, the defendant county three. These drains collected the surface waters. The defendant flood control district built its structures in the middle reaches of La Ballona Creek to deepen, widen and straighten the channel, and constructed levees along the banks to confine the water to the channel of the creek. These improvements followed the former natural watercourse and entailed no diversion of water from without the watershed. They caused the water to run off faster from the drainage area and increased the volume flowing into La Ballona Lagoon, the main outlet into the ocean. The surface water collected by the storm drains emptied into a large basin *where the improvements ended*

*some three miles east of the lagoon.* The water in the basin entered the lagoon at two places and flowed through it to the only outlet into the ocean.

It is the contention of the plaintiffs that ''by said operation and the inadequate outlet into the ocean a *'cul de sac'* was formed,'' which had the effect of impounding the storm waters and causing them to overflow the banks of said lagoon.

On December 31, 1933, and January 1, 1934, a heavy rain occurred and the storm waters went down La Ballona Creek and into the lagoon where they overflowed and flooded to a depth of six to eight feet for about four days the properties of the plaintiffs and their assignors *located some three miles north of the lagoon or main outlet* into the ocean, which properties were *not riparian to the lagoon or La Ballona Creek.* These actions for damages followed, and each complaint alleges five causes of action. The first cause alleges that the defendants were negligent in constructing and maintaining an ''artificial'' drainage system of insufficient size in that the lagoon outlet was inadequate to carry and discharge into the ocean the concentrated and accelerated flow of water which resulted from the high-speed impervious concrete storm drains installed by defendants. The second cause alleges that while the improvement of the drainage area was for a public use and purpose no compensation was made to the plaintiffs and their assignors for the damage thereby caused to their property. The third cause alleges that the defendants disregarded plaintiffs' rights by constructing a drainage system which caused more storm or surface water to be carried into La Ballona Lagoon than it could carry, and by failing to remove such obstructions in the lagoon as bridges and an oil derrick. The fourth cause alleges that the defendants have by means of the concrete storm drains and conduits ''diverted'' water from the streets within the drainage area to the plaintiffs' property in increasing quantities and with destructive force. The fifth cause alleges that the defendants have caused and permitted obstructions in and across the lagoon outlet without taking the necessary precautions against the overflow of storm waters flowing therein.

Prior to the consolidation of these two actions for trial, a demurrer of the defendant flood control district to the first, fourth and fifth causes of action was sustained without

leave to amend in the Archer case. Upon appeal it was stated, in part, by the District Court of Appeal that "The gist of [the] . . . complaint . . . is that respondent constructed and built an artificial drainage system so defectively, carelessly and negligently that it would not carry the storm waters to the Pacific Ocean as designed and intended" and "that the injury to the appellants occurred by reason of the fact that respondent negligently turned the storm waters into La Ballona lagoon, which was too small to conduct the water turned into it by and through the drainage system constructed, operated and maintained by respondent. . . . " The District Court of Appeal thereupon reversed the judgment entered upon the sustaining of the demurrer without leave to amend, concluding that the complaint adequately alleged causes of action in the respects mentioned. (*Archer* v. *City of Los Angeles,* 15 Cal. App. (2d) 520 [59 Pac. (2d) 605].) This is of significance upon this appeal since the motion for nonsuit made (and here granted) at the close of the plaintiffs' case operates as a demurrer to the evidence. (See cases cited in 9 Cal. Jur. 551, sec. 35.) If, as held by the District Court of Appeal, the complaint in the Archer case (identical with that in the Allison case) states causes of action for damages based on the negligent or defective construction of public works, and the evidence thereafter adduced by the plaintiffs tends to establish the allegations of the complaints, the trial court must be held to have erred in nonsuiting the plaintiffs. It is settled that "A nonsuit should be granted only when, accepting the full force of the evidence adduced, together with every reasonable inference favorable to the plaintiff, which may be drawn therefrom, and excluding all evidence in conflict therewith, it still appears that the law precludes the plaintiff from recovering a judgment under such circumstances." (*Mastrangelo* v. *West Side U. H. School Dist.,* 2 Cal. (2d) 540, 544 [42 Pac. (2d) 634]; *Angelus Sec. Corp.* v. *Ball,* 20 Cal. App. (2d) 423, 436 [67 Pac. (2d) 152, 158].)

The witness Frisbie, a civil engineer, who had been familiar with the La Ballona drainage area for approximately eighteen years, described its natural state and subsequent development. He pointed out that engineers employ two principal methods to control flood waters: to retard and hold them back in storage reservoirs, or to *confine the waters that*

*naturally flow over porous soils to line channels* at high speed so that more water will flow to the outlet at given times. He added that the problem in the latter method, which he stated *was employed by the defendants* to drain the La Ballona watershed, is the outlet. He testified that the effect of the concrete storm drains and the straightening and widening of the La Ballona channel *to concentrate the run-off, was not only to accelerate the flow but to cause more water to flow down* because it was no longer in part lost in absorption or evaporation. "To discharge that water through these high-speed drains, concentrate, and discharge it right out into open space, with no control over it, and then a thoroughly bottled up outlet, in my opinion, would be very bad engineering. . . . The capacities of the outlets into the lagoon between the sand bar and the sand dunes, in the condition in which they were during that period, were insufficient to carry off the water, to carry the water away as fast as it was arriving." He gave a negative answer to the question whether it was "good engineering to construct an elaborate system of storm drains in the upper part of the La Ballona Creek watershed, and for the Los Angeles County Flood Control District to construct a fine, high-speed main channel down to and beyond Centinela Boulevard, and then turn the storm water loose at that point with such facilities as existed for its escape into La Ballona Lagoon, as existed on December 31, 1933." As reasons therefor he added: "Because the construction of all these high-speed drains and the great areas of impervious surfaces greatly increased the quantity of storm waters that would arrive down in that area at a given time, and would require good, ample facilities for an outlet capacity far greater than it required under the natural conditions of that watershed, when a great deal of that water never got there, because it was absorbed in the debris cones and absorbed in the brush and all kinds of growth, and when it approached at very slow velocities through these cienagas and over the natural surface—to turn that loose at that point with no open, flat country and no possible way to force that water through a limited outlet without piling the water up several feet deep, in my opinion, was not good engineering."

The witness Bell, a consulting civil engineer, who many years earlier had done some work for the defendant flood

control district and the defendant county in connection with La Ballona Creek, described the area in its natural and subsequently altered state much as did the witness Frisbie. He, too, testified that it was not "good engineering to construct an elaborate system of storm drains in the upper part of La Ballona watershed, and for the Los Angeles County Flood Control District to construct a fine, high-speed main channel down to and beyond Centinela bridge . . . and then turn the storm waters loose at the point with such facilities as existed for its escape into La Ballona Lagoon, as existed on December 31, 1933 . . . because if there were no facilities for the escape of that water when it got down to the estuary of La Ballona, there was created what you might call practically a *cul de sac*. It could not get out. It was bound to collect like a reservoir and spread out all over the country; nothing to prevent it."

A series of letters, placed in evidence by the plaintiffs as exhibits, definitely indicate that the *appropriate officers of the three defendant entities had knowledge for several years prior to the flood here involved of the imperative necessity for a change in the La Ballona outlet to the ocean.* On January 6, 1931, the chief engineer of the defendant flood control district addressed a letter to the board of supervisors of the defendant county wherein he stated that in the previous month he had received a letter from the Venice Chamber of Commerce requesting the "construction of a dyke to protect Venice from flood waters." In his letter the chief engineer pointed out to the board that "The *natural rate of flow of La Ballona Creek has been greatly increased due to the discharge into it of six (16 in 1933) storm drains of which four are Los Angeles City, one Culver City and one County Drain.* The Flood Control District has during the past summer enlarged and cleaned the entire channel where rights of way were obtained. Lacking an adequate outlet to the ocean the channel capacity *has each year been barely sufficient to handle the relatively low flows that have occurred* and in the event of a major or even a moderate flood two principal locations would be subject to damage. 1. The City of Venice. 2. Culver City and vicinity. . . . " In an earlier letter (1930) to the board of supervisors in which the chief engineer discussed the *drainage changes* that had been made in the area and of the then existence of five

storm drains (county and city) and of the proposal of the city to construct five additional drains, he added "to fully relieve the present situation an outlet to the ocean is essential."

It is manifest that the foregoing facts are sufficient to make a *prima facie* case in accordance with plaintiffs' allegations and to establish what the District Court of Appeal declared to be the gist of the Archer action, that is, that "The gist of [the] . . . complaint . . . is that respondent constructed and built an artificial drainage system so defectively, carelessly and negligently that it would not carry the storm waters to the Pacific Ocean as designed and intended" and "that the injury occurred by reason of the fact that respondent negligently turned the storm waters into La Ballona Lagoon, which was too small to conduct the water turned into it by and through the drainage system constructed, operated and maintained by respondent. . . . " (*Archer* v. *City of Los Angeles, supra.*) On the doctrine of the law of the case, as to the Archer case, and *stare decisis*, as to the Allison case, it must be held that plaintiffs have established the liability of defendants.

The attempted answer to that incontrovertible proposition advanced by the majority opinion is that: "According to the allegations of the complaint, the damage resulted because defendants negligently *diverted* water out of its *natural channel*, and obstructed the channel of the creek. Plaintiffs evidence, however, fails to substantiate such allegations." That statement is palpably incorrect. The gist of the action as stated by the District Court of Appeal was *not* that water had been "*diverted* out of its natural channel," rather it was that the defendants negligently "turned the storm waters into La Ballona Lagoon," that is, collected surface waters and discharged them into the lagoon. The evidence without contradiction shows that that occurred. The storm waters were collected into drains and turned into the lagoon and creek, the outlet of which was too small to carry them, with the result that plaintiffs' lands were flooded when the lagoon overflowed. The prior decision is therefore the law of the case and controlling here.

The true basis of liability in cases of this character is found in the constitutional provision prohibiting the taking or damaging of property for a public use without the pay-

ment of just compensation. (California Constitution, art. I, sec. 14.) The liability exists independent of negligence on the part of the public agency. (*Tormey* v. *Anderson-Cottonwood Irr. Dist.*, 53 Cal. App. 559 [200 Pac. 814]; *Elliott* v. *County of Los Angeles*, 183 Cal. 472 [191 Pac. 899]; *Kaufman* v. *Tomich*, 208 Cal. 19 [280 Pac. 130].) In the instant case the evidence shows that the defendants launched and constructed an extensive public improvement, to-wit: The drainage of the area above-mentioned into the Pacific Ocean. It establishes that the improvement was inherently improper, was negligently planned and carried out, and was contrary to skillful engineering practices. The drainage of the water into the Pacific Ocean could not be accomplished without flooding plaintiffs' land with the condition of the outlet from La Ballona Lagoon being in the condition in which it existed. Further, the evidence shows that defendants knew of that condition. It cannot be said that the object and design of the drainage system did not include the discharge of the drainage water into the ocean. That discharge was necessarily an inseparable part of the entire drainage scheme. Defendants were obligated therefore either properly to improve the outlet or to compensate anyone whose property was damaged by reason of the insufficiency of the improvement. They knew that the improvement would result in the flooding of property; that flooding was a necessary and component part of the entire system, and as they failed to acquire by eminent domain the right to so flood the property, then they must now compensate the owners thereof for the injury thereby caused. In essence the situation is no different than if defendants had constructed an outlet from the lagoon to the ocean which was too small to carry the water and a flood resulted. They adopted the natural outlet known to be insufficient in size as a part and parcel of the improvement, the drainage system. The case is not essentially different from *Kaufman* v. *Tomich, supra*. There the improvement consisted of a sewer line in a street. While the sewer ditch was open, plaintiff's property, lying adjacent to the street, was damaged by the shifting of the soil upon which rested the foundation of her building. This court in affirming a judgment for plaintiff stated at page 21:

" . . . that if the act commanded by the municipality was inherently wrong, then both the municipality and the agent

performing the work would be answerable in damages to anyone injured thereby, even in the absence of negligence in its performance. This declaration finds support in *Perkins* v. *Blauth,* 163 Cal. 782, 789 (127 Pac. 50, 53), wherein the rule is expressed in the following language: 'Upon the other hand, if the act is one commanded by the municipality itself, if inherently wrong, the municipality and the agent who performed will both be liable. . . . If the injury results, however, not from the wrongful plan or character of the work, but from the negligent or improper manner in which it is performed, the one so negligently acting will always be responsible, and the public corporation may or may not be responsible, depending upon the relationship which it may sustain to that agent.' Being satisfied that the trial court, on competent evidence, has found the plan and location of the sewer to be inherently wrong and dangerous, Judge Strother declared, as his opinion, that judgment was properly entered against both defendants.'' The trial court had found in the Kaufman case that the ''location and alignment of the said sewer were intrinsically dangerous and inherently wrong, and were of such a nature and of so close proximity to the front of plaintiff's property and plaintiff's wall *as were likely in the natural course of construction of the said sewer*—to damage and injure said . . . property. . . . '' (Emphasis added.) In the cases at bar the evidence is capable of the construction that the drainage system without a proper outlet was not only likely but certain to cause the flooding of plaintiffs' land and the defendants knew that result would follow. Reference may be made to the language in *Conniff* v. *San Francisco,* 67 Cal. 45, 50 [7 Pac. 41], involving the flooding of plaintiff's land by the construction of a street which dammed a stream:

''The case before us is not one of mere consequential damage which the land owner must protect himself against, and for which the law affords him no redress. It is a direct trespass on the property of plaintiff by the construction of a dam *which a moment's reflection would have made clear to any one, must inevitably in the course of nature have resulted in the permanent overflowing the land of plaintiff* when the rainy season came, and from which he could only free himself by cutting away a public highway, for which he might have been proceeded against both by a civil and

criminal action.'' (Emphasis added.) In the instant case, not only would a moment's reflection have made it clear to anyone that plaintiffs' land would be flooded, but *defendants actually knew it.* In *Spangler* v. *San Francisco,* 84 Cal. 12 [23 Pac. 1091, 18 Am. St. Rep. 158], the construction of a street along a stream interfered with the flow therein, and defendant provided sewers or storm drains to carry the waters thereof to Mission Bay; by reason of disrepair the sewer failed to carry the water and plaintiffs' property was flooded. This court said at page 17:

''It was the duty of the city, when it does provide water- ways, *to provide such as are sufficient to carry off the water that might reasonably be expected to accumulate.* The rule is so laid down in *Damour* v. *Lyons City,* 44 Iowa, 282; ap- proved and followed in *Powers* v. *City of Council Bluffs,* 50 Iowa, 201, 202. (See *Mayor of New York* v. *Bailey,* 2 Denio, 433.) We think the rule above stated correct, and approve it.'' (Emphasis added.) And at page 19:

''Dillon states that 'there is a municipal liability where the property of private persons is flooded, either directly or by water being sent back, when this is the result of the negli- gent execution of the plan adopted for the construction of gutters, drains, culverts, or sewers, or of the negligent failure to keep the same in repair and free from obstruction, and this, whether the lots are below the grade of the streets or not. The cases support this proposition with great unanim- ity.' ''

In *Stanford* v. *San Francisco,* 111 Cal. 198 [43 Pac. 605], the' construction of a street (analogous to the drains in the cases at bar) by a city caused the collection of surface water which flowed into plaintiff's basement because of insufficient drainage facilities. It was held that the city was liable, this court stating at page 202:

''Here the grade of Jessie street was not changed, nor is there any claim that the premises occupied by plaintiffs were below grade. Here a street, which before it was paved absorbed the water falling upon it, by the paving is made to retain and collect the same upon its surface, no means being provided for removing or conducting it away. The portion of the street so paved crossed no street or alley by which it could be diverted, and as the easterly end was more than two feet lower than its westerly end, and was absolutely

closed at the lower end by a building which crossed it, *it was inevitable that the water falling on that portion of the street below Fourth street would be collected and retained until it could escape by flowing. over the curb and sidewalk and into the basement occupied by the plaintiffs. . . .*

"Counsel for appellant cites section 1039 of Dillon's Municipal Corporations in support of the proposition that 'the law regards surface water as a common enemy, which every proprietor may fight or get rid of as best he may.'

"That section and the two following are devoted to the subject of 'liability in respect of surface water,' and the last of these (section 1041) is devoted to the question of the 'omission to provide drains.' The learned author says: 'It is clear that there is no liability on the part of a municipal corporation for *not* exercising the discretionary or legislative powers it may possess to improve streets, and as part of such improvement, to construct gutters or provide other means for draining for surface waters, so as to prevent them from flowing upon the adjoining lots.' But in note 2 to said section it is said: *'If the necessity for the drainage is caused by the city, the doctrine of the text* (section 1041) *that it is not bound to supply the drainage does not apply.'* Even as applied to property below the level of the street the same learned author says: 'It is possible there may be no middle ground; but we are unable to assent to the doctrine that by reason of their control over streets, and the power to grade and improve them, the corporate authorities have the absolute and unconditional legal right intentionally to divert the water therefrom, as a mode of protecting the streets, and to discharge it by artificial means, in increased quantities and with collective force and destructiveness, upon the property, perhaps improved and occupied, of the adjoining owner.' (Dillon on Municipal Corporations, sec. 1042.) In a note to this section, in the fourth edition, he says: 'The many cases since decided, cited in the notes, have found and defined the "middle ground," therein referred to, and adjudged the law to be as stated in the text.'

"In *Ashley* v. *Port Huron,* 35 Mich. 296, 35 Am. Rep. 552, it was held that where a city constructed a sewer in such manner as to throw a large quantity of water upon plaintiff's premises which otherwise would not have flowed there, it was liable for the damage caused thereby. In the

opinion in that case, after referring to a great many authorities, Chief Justice Cooley said: 'It is very manifest, from this reference to authorities, that they recognize in municipal corporations no exemption from responsibility where the injury an individual has received is a direct injury accomplished by a corporate act which is in the nature of a trespass upon him. The right of an individual to the occupation and enjoyment of his premises is exclusive, and the public authorities have no more liberty to trespass upon it than has a private individual. If a corporation send people with picks and spades to cut a street through it without first acquiring the right of way, it is liable for a tort; but it is no more liable under such circumstances than it is when it pours upon his land a flood of water by a public sewer so constructed that the flooding must be a necessary result. The one is no more unjustifiable than the other. Each is a trespass, and in each instance the city exceeds its lawful jurisdiction. A municipal charter never gives and never could give authority to appropriate the freehold of a citizen without compensation, whether it be done through an actual taking of its streets or buildings, or by flooding it so as to interfere with the owner's possession. His property right is as much appropriated in the one case as in the other.'

"In *Seifert* v. *Brooklyn*, 101 N. Y. 136, 142, 54 Am. Rep. 664, it was said: 'Municipal corporations have quite invariably been held liable for damages occasioned by acts resulting in the creation of public or private nuisances, or for an unlawful entry upon the premises of another whereby injury to his property has been occasioned. (*Baltimore etc. R. R. Co.* v. *Fifth Baptist Church*, 108 U. S. 317 [2 Sup. Ct. 719, 27 L. Ed. 739].) This principle has been uniformly applied to the act of such corporation in constructing streets, sewers, drains and gutters, whereby the surface water of a large territory, *which did not naturally flow in that direction*, was gathered into a body, and thus precipitated upon the premises of an individual, occasioning damage thereto.' (See also note to *Chalkley* v. *Richmond*, 29 Am. St. Rep. 742, under the head 'Surface Water,' where a large number of cases from many different states are cited.)

"In *Los Angeles Cemetery Assn.* v. *Los Angeles*, 103 Cal. 461, 470 [37 Pac. 375], the same principle is asserted; and

in the later case of *De Baker* v. *Southern Cal. Ry. Co.,* 106 Cal. 257, 282 [39 Pac. 610] 46 Am. St. Rep. 237, it was said: 'But if the work was inherently and according to its plan and location a dangerous obstruction to the river, such as ordinary prudence should have guarded against, not only the author of the plan to obstruct the stream (the city of Los Angeles), but the person placing the obstruction, was severally liable for the entire damage.' (See, also, *Reardon* v. *San Francisco,* 66 Cal. 492 [6 Pac. 317], 56 Am. Rep. 109, where the city was held liable for an injury to plaintiff's lot caused by work done upon the street, which was the immediate, direct and necessary effect of the work done.)

"*Corcoran* v. *Benicia,* 96 Cal. 1 [30 Pac. 798], 31 Am. St. Rep. 171, and the other cases cited by appellant on page 5 of his brief do not conflict with the authorities which we have cited above. *Corcoran* v. *Benicia, supra,* is to the effect that a municipal corporation is not liable for damages caused by the prevention of the flow of surface water *from* the lot of a private owner, by raising the street to the grade, where such water does not run in a natural channel across the lot. The distinction between that case and this is obvious, and the other cases cited by appellant rest upon similar facts." (Emphasis added.)

There is no distinction between failure to provide a proper sewer to carry off the surface waters collected by the municipality, and a failure to provide a proper outlet from La Ballona Lagoon. Also there is no distinction between the paving of a street which thereby collected surface water and discharged it on plaintiff's land and accomplishing the same result by concrete drains.

It is said in 43 Corpus Juris 1126, in regard to establishment of drainage systems by municipalities:

"But according to a number of authorities this rule does not extend to exempt a municipality from liability for negligence in the adoption of a plan for drains or sewers, and where the municipal authorities negligently adopt or devise a plan or system which is obviously defective, or the unfitness of which has been demonstrated by previous experience, the municipality is liable for the resulting damage. It has also been laid down that the rule under discussion is subject to the distinction that, where the plan adopted by a mu-

nicipality must necessarily cause an injury to private property, equivalent to some appropriation of the enjoyment thereof to which the owner is entitled, then the municipality is liable, but where the fault found is with the wisdom of the measure or its sufficiency or adaptability to carry out or accomplish the purpose intended, and where its construction according to the plan adopted invades no private rights, then the municipality is not liable.''

*Pacific Seaside Home* v. *Newbert P. Dist.*, 190 Cal. 544 [213 Pac. 967], is a case precisely in point and squarely contrary to the holding of the majority opinion. This court said in that case at page 546:

''The gist of the plaintiff's complaint is that the defendant *constructed channels for the water of the Santa Ana River so defectively and negligently that they would not carry the waters of the stream.* Plaintiff alleges that 'had the defendant not changed the natural course of the Santa Ana River, *or in anywise interfered with its natural flow, the waters of the Santa Ana River would have flowed on into Newport Bay and no damage would have accrued to the plaintiff had the said river been permitted to flow as it naturally would* had not the defendant constructed its channel to divert the same. . . . ' It is further alleged in effect that the injury occurred to the plaintiff by reason of the fact that the defendant *negligently turned the waters of the Santa Ana River in a channel which was too small,* and which was negligently constructed and maintained, and that by reason thereof it was damaged.

''These facts sufficiently state a cause of action.'' (Emphasis added.)

In the cases at bar defendants constructed drains, altered the channel and interfered with the natural drainage and discharged the waters into the lagoon, the outlet of which ''was too small,'' all to the damage of plaintiffs.

Commencing with the premise that the state or an agency thereof would not be liable for the flooding of plaintiffs' lands, if an individual would not be responsible for the same conduct, the majority opinion concludes that defendants are not liable because: ''It is established in California and other jurisdictions that a lower owner has no right of redress for injury to his land caused by improvements made in the stream for the purpose of draining or protecting the land

above, even though the channel is inadequate to accommodate the increased flow of water resulting from the improvements.'' (Obviously the statement is directly contrary to *Pacific Seaside Home* v. *Newbert P. Dist., supra.*) In connection therewith it is also stated: ''Likewise there is no diversion if surface waters, flowing in no defined channel, are for a reasonable purpose gathered together and discharged into the stream that is their natural means of drainage even though the stream channel is inadequate to accommodate the increased flow. A California landowner may not collect such waters and discharge them upon adjacent land . . . but *he may discharge them for a reasonable purpose into the stream into which they naturally drain without incurring liability for damage to lower land caused by the increased flow of the stream.''* (Emphasis added.) Those propositions are entirely out of line with the long and firmly established law in California with respect to surface waters. An upper owner may not collect surface waters in channels and thereby cause them to flow upon a lower owner's land in increased volume to his damage. This rule has been commonly referred to as the civil law rule as distinguished from the common law rule. The rule in this state was stated many years ago in *Conniff* v. *San Francisco, supra,* at page 49:

''An individual has no right to collect in artificial channels mere surface water, and precipitate it upon the land of another. Nor has a corporation, whether public or private, the right to collect in such channels mere surface water precipitated by rain or snow over large districts, and throw it upon the property of another. The cases to this effect are numerous, and may be found cited in a note to section 272 of Gould on Waters.'' (See, also, *Los Angeles C. Assn.* v. *Los Angeles,* 103 Cal. 461 [37 Pac. 375]; *Stanford* v. *San Francisco, supra; Rudel* v. *Los Angeles County,* 118 Cal. 281 [50 Pac. 400]; *Larrabee* v. *Cloverdale,* 131 Cal. 96 [63 Pac. 143]; *Wood* v. *Moulton,* 146 Cal. 317 [80 Pac. 92]; *Galbreath* v. *Hopkins,* 159 Cal. 297, 298 [113 Pac. 174]; *Shaw* v. *Sebastopol,* 159 Cal. 623 [115 Pac. 213]; *Heier* v. *Krull,* 160 Cal. 441 [117 Pac. 530]; *Thomson* v. *La Fetra,* 180 Cal. 771 [183 Pac. 152]; *Le Brun* v. *Richards,* 210 Cal. 308 [291 Pac. 825, 72 A. L. R. 336]; *Switzer* v. *Yunt,* 5 Cal. App. (2d) 71

44

[41 Pac. (2d) 974]; *Everett* v. *Davis,* 18 Cal. (2d) 389 [115 Pac. (2d) 821].)

Even though the surface waters collected are discharged in a natural channel on the upper owner's land, he is liable for flooding the land of the lower owner where the cause of the flooding is the increase in the volume of the water flowing to the lower owner beyond the capacity of the stream.

The true rule with respect to the drainage of surface waters and rights in relation thereto is set forth in *Le Brun* v. *Richards, supra.* Although the factual situation there was not the same as here the rule there announced is applicable to a factual situation such as that here involved. It was there stated:

" ' . . . From these rights and burdens, the principle follows that he has a lawful right to complain of others, who, by *interfering* with natural conditions, cause such surface water to be *discharged in greater quantity or in a different manner upon his land than would occur under natural conditions.* This is the settled law of this state.' In support of the above statement the court cites a long array of earlier decisions. On the other hand, a different rule applies in the case of flood waters. Such waters are regarded as 'a common enemy against which every man has a right to defend himself, regardless of the fact that the barriers he erects for the protection of his land may cause the flood to rise higher or flow with greater force upon his neighbors.' (*McDaniel* v. *Cummings,* 83 Cal. 515 [8 L. R. A. 575, 23 Pac. 795, 797].) This rule has been enunciated and applied in a number of cases, among which may be mentioned *Lamb* v. *Reclamation Dist.,* 73 Cal. 125 [2 Am. St. Rep. 775, 14 Pac. 625], *Sanguinetti* v. *Pock,* 136 Cal. 466 [89 Am. St. Rep. 169, 69 Pac. 98, 99], *Gray* v. *Reclamation Dist.,* 174 Cal. 622 [163 Pac. 1024], and *Horton* v. *Goodenough,* 184 Cal. 455 [194 Pac. 34, 35]." And again at page 315:

"The upper proprietor may not divert by artificial means the surface waters upon his own lands to the lands of the lower proprietor *nor may he accelerate by means of ditches or increase the drainage of his own land to the injury of the lower owner.* His right 'is limited to the disposition of the water through the chosen channels of nature.' (*Board of Trustees* v. *Rodley, supra.*)" (Emphasis added.)

By the weight of authority the right of an upper owner to drain surface water into a watercourse is qualified to the extent that the flow must not be increased beyond the capacity of the stream; the flow of a stream cannot be increased beyond its natural capacity as was done here to the injury of one's property below by flooding. (Thompson on Real Property, Perm. Ed., vol. 2, sec. 663; *Ryder* v. *Town of Lexington,* 303 Mass. 281 [21 N. E. (2d) 382]; *North Dakota* v. *Minnesota,* 263 U. S. 365 [44 Sup. Ct. 138, 68 L. Ed. 342]; *Jackman* v. *Arlington Mills,* 137 Mass. 277; *Belcastro* v. *Norris,* 261 Mass. 174 [158 N. E. 535]; *Smith* v. *Orben,* 119 N. J. Eq. 291 [182 Atl. 153]; *McCormick* v. *Horan,* 81 N. Y. 86 [37 Am. Rep. 479]; *Spink* v. *Corning,* 61 App. Div. 84 [70 N. Y. Supp. 143]; note, 28 A. L. R. 1262). And that rule is applicable where the one doing the draining is a public corporation. (*Sisters of St. Joseph Corp.* v. *Atlas Gravel & Stone Co.,* 120 Conn. 168 [180 Atl. 303]; *Baldwin* v. *Ohio Twp.,* 70 Kan. 102 [78 Pac. 424, 109 Am. St. Rep. 414, 67 L. R. A. 642]; *Hicks* v. *Owensboro,* 6 Ky. L. Rep. 226; *Noonan* v. *Albany,* 79 N. Y. 470 [35 Am. Rep. 540]; *McCutchen* v. *Peekskill,* 167 Misc. 460 [3 N. Y. Supp. (2d) 277]; *Ryder* v. *Town of Lexington, supra; Miller* v. *City of Woodburn,* 134 Ore. 536 [294 Pac. 349]; McQuillin Mun. Corps., vol. 6, secs. 2874, 2878, 2881, 2882, 2885.)

The obvious result of the conclusion reached in the majority opinion is that an upper owner may, with absolute impunity, gather surface waters on his land in any quantity, discharge them into a stream, and thereby flood the land of a lower owner even though that lower owner's land is not riparian to the stream, is three miles away from the stream, and has never been burdened with surface waters in connection with the stream involved or from the drainage area involved. The authorities relied upon by the majority opinion for that shocking proposition are not in point when applied to a factual situation disclosed by the record in these cases. They consist, with a single exception, of cases from other jurisdictions. A review of several of them reveals their character. The case of *Board of Drain. Com'rs. etc.* v. *Board of Drain. Com'rs.,* 130 Miss. 764 [95 So. 75, 28 A. L. R. 1250], predicated its holding on the premise that an *upper riparian owner by virtue of his ownership,* may collect the surface waters and discharge them into a stream

even though a lower riparian owner is injured. *That case conceded that the weight of authority was to the contrary.* Furthermore, the conduct involved was not the act of any one upper owner which caused the flooding; that result followed only because of a similar practice by many owners. (See *Drainage Dist.* v. *Haverstick,* 186 Ark. 374 [53 S. W. (2d) 589, 590, 591].) That is not the case here. In *City of Hamilton* v. *Ashbrook,* 62 Ohio St. 511 [57 N. E. 239], the flooding was caused by the breaking of a levee and not by excess drainage into the stream.

In *Peck* v. *Herrington,* 109 Ill. 611 [50 Am. Rep. 627], the right was limited to the flow of surface waters into *natural* channels. In that case the court said: ''The *natural* flow of the surface water was *not changed*. . . . '' (Emphasis added.) In the cases at bar surface water is collected in artificial channels and the flow increased.

The language in *Robb* v. *Village of La Grange,* 158 Ill. 21 [42 N. E. 77], is *dictum*.

In *O'Donnell* v. *City of Syracuse,* 184 N. Y. 1 [76 N. E. 738, 112 Am. St. Rep. 558, 6 Ann. Cas. 173, 3 L. R. A. (N. S.) 1053], the flooding was caused by an act of God and not the discharge of drainage waters. The court stated at page 743: ''The plaintiff and the other citizens affected by the flood *were no worse off than they would have been if the creek had not been used at all for sewerage purposes,* except for the incidental deposit of sewage matter.'' (Emphasis added.) Plaintiffs in the cases at bar are undeniably worse off because of the drainage system.

*Dudley* v. *Village of Buffalo,* 73 Minn. 347, 76 N. W. 44, is clearly not in point. There the court stated at page 45: ''It is clear, then, that the village is not liable for putting in the upper drain, and thereby carrying the water across the street, because it *did not gather the surface water,* and unnecessarily discharge it in a stream upon the plaintiff's premises, where it did not naturally belong.'' (Emphasis added.)

*Waffle* v. *New York Central R. R. Co.,* 53 N. Y. 11 [13 Am. Rep. 467], is distinguished in a *later* New York case which recognizes and applies the rule that an upper riparian owner may not collect surface waters and discharge them into a stream in excess of its capacity. In *Noonan* v. *City of Albany,* 79 N. Y. 470 [35 Am. Rep. 540], the court in limiting

the rule of the Waffle case stated at page 477: "The right of a riparian owner to drain the surface-water on his lands into a stream which flows through them, and which is its natural outlet, is an incident to his right as riparian owner to the reasonable use of the stream. But this right is not, we conceive, an absolute right under all circumstances, *irrespective of the size of the stream*, or the natural purpose which it subserves, to throw into it surface-water by means of ditches or drains, when by so doing it will be *filled beyond its natural capacity, and overflow and flood the lands of a lower proprietor.*" (Emphasis added.) This is directly in accord with the views herein expressed by me.

*City of Maysville* v. *Brooks*, 145 Ky. 526 [140 S. W. 665], does not involve a factual situation in any way analogous to the cases at bar.

In *Strauss* v. *Allentown*, 215 Pa. 96 [63 Atl. 1073, 7 Ann. Cas. 686], the court applied the *"common enemy"* rule to *surface* waters. It cannot be doubted that such rule is applicable *only* to flood waters in California, and may *not* be applied to surface waters. (26 Cal. Jur. 279–293.) The same is true of *Jefferson County Drainage Dist.* v. *McFaddin*, (Tex. Civ. App.) 291 S. W. 322. *City of Ludlow* v. *Broderick*, 181 Ky. 123 [203 S. W. 1082], recognized the limitation on the right to collect and discharge surface waters. The court said at page 1083:

"Finally it is insisted that the smooth surface of the brick street has facilitated the flow of the water and allowed it to pass freer and faster but in the *same* course and *quantity*. The rule recognized in this state does not allow a recovery by a lower or servient estate for damages where the quantity of water is not increased nor caused to flow in a new or different course or channel. So long as the *volume of the water remains the same* and is confined to its usual and ordinary course there is not actionable wrong in facilitating its flow by cleaning the channel or leveling the surface so as to let it pass without obstruction or run rapidly." (Emphasis added.)

The same is true of *Manteufel* v. *Wetzel*, 133 Wis. 619, 114 N. W. 91, the court stating at page 92:

"In other words, causing surface water to flow in its natural direction through a ditch on one's own land instead

of over the surface or by percolation as formerly, where no new watershed is tapped by said ditch and *no addition to the former volume of surface water is caused thereby,* except the mere carrying in a ditch what formerly reached the same point on defendant's land over a wider surface by percolation through the soil or by flowing over such wider surface, is not, when not negligently done, a wrongful or unlawful act." (Emphasis added.)

A similar comment applies to *Trigg* v. *Trimmerman,* 90 Wash. 678 [156 Pac. 846, L. R. A. 1916F, 424].

A further review of the authorities from other jurisdictions relied upon by the majority opinion would serve no useful purpose. Most of them do not stand for the rule for which they are cited; many are, on the contrary, in accordance with the views herein expressed. In any event as has heretofore been seen those apparently in point are out of line with the weight of authority.

The only case in California cited in the majority opinion for the foregoing propositions is *San Gabriel Valley Country Club* v. *County of Los Angeles,* 182 Cal. 392 [188 Pac. 554, 9 A. L. R. 1200]. Not only are the facts of that case inaccurately stated in the majority opinion, but the purported holding therein relied upon is *dictum* and was in no way necessary to the decision of that case. In that case the county of Los Angeles placed concrete conduits in a *natural watercourse.* The watercourse flowed through plaintiff's land which was riparian thereto and was situated about a mile below the point where the conduit ended. The conduit accelerated the flow of the stream causing erosion where the stream flowed through plaintiff's land. There was not any construction of "concrete storm drains" as stated in the majority opinion; the conduit was placed in and as a part of a *natural watercourse.* There was *no collecting of surface waters by the construction of drains* and the discharge therefrom of water into a natural watercourse, as exists in the cases at bar. There was no evidence of any flooding of plaintiff's land or that the conduit caused water to flow in the stream in excess of its capacity. This court there said at page 404: *"It does not appear from the findings in the present case whether the plaintiff's land was flooded or not."* (Emphasis added.) It is quite apparent therefore that the San Gabriel case is *not* similar to the cases at bar on its

*facts,* and anything stated therein with respect to gathering surface waters and discharging them into a stream followed by a flooding of a lower owner's land because the capacity of the stream was overtaxed, is nothing but *dictum* and not here controlling. Furthermore, the views so expressed are in conflict with the law in this state with respect to surface waters, and are in effect discarded by *Le Brun* v. *Richards, supra,* which at a later date expressed the true California rule on the subject.

In addition to the foregoing discussion there are many other respects in which the San Gabriel case is not properly an authority for the rules enunciated in the majority opinion. First, it is said in that case, at page 396:

"But the whole effect of the drains, so far as increasing the volume in the stream is concerned, may be summed up by saying that they *add no water to that already in the channel* and that which would come to it on the way, but merely serve to pass such waters more completely and more speedily from one point in the channel to another, all entirely above the plaintiff's land." (Emphasis added.)

In the cases at bar the drains do *add* water to that already in the channel by collecting and discharging the surface water therein. Second, the court states in the cited case, at page 396:

"The plaintiff's land is a mile or more below the lower end of the drains, and *any impetus the water may have as it emerges from the drains must be lost long before reaching the plaintiff's land.* There is no increase in velocity, in other words, except such as is a necessary incident of an increased volume." (Emphasis added.)

In other words any increased velocity of the flow was lost before the stream reached plaintiffs' land. Third, it is stated therein that it does not appear "that it (the conduit in the watercourse) was constructed in a manner more burdensome to the plaintiff than was required for the purpose for which it was constructed." In the instant cases the evidence is clear that the flooding of plaintiffs' land could have been avoided if the outlet to the ocean had been given proper attention. Fourth, the waters involved in the San Gabriel case were *not surface waters;* here the waters collected by the drains which run into the La Ballona Creek conduit are

surface waters which are collected by artificial means, the drains, and discharged into La Ballona Creek. The increase of water so brought about contributed to the flooding. It is said in the San Gabriel case, at page 398:

"It should also be observed at the outset that the present case is *not concerned with surface waters*. Such waters in the legal sense are those which fall on the land by precipitation from the skies or arise in springs and spread over the surface of the ground without being collected into a definite body. (*McDaniel* v. *Cummings,* 83 Cal. 515 [8 L. R. A. 575, 23 Pac. 795]; 3 Farnham on Waters, sec. 278.) As to such waters the rule has been established by numerous decisions in this state that *a land owner may not gather them together on his land* by artificial means and discharge them on to lower lying land in greater volume or in a different manner than they would naturally be discharged. Of this character are the following decisions cited on behalf of the plaintiff: *Conniff* v. *San Francisco,* 67 Cal. 45 [7 Pac. 41]; *Stanford* v. *San Francisco,* 111 Cal. 198 [43 Pac. 605]; *Cushing* v. *Pires,* 124 Cal. 663 [57 Pac. 572]; *Galbreath* v. *Hopkins,* 159 Cal. 297 [113 Pac. 174]; *Shaw* v. *Sebastopol,* 159 Cal. 623 [115 Pac. 213]; *Heier* v. *Krull,* 160 Cal. 441 [117 Pac. 530]; *Cox* v. *Odell,* 1 Cal. App. 682 [82 Pac. 1086]; *Peck* v. *Peterson,* 15 Cal. App. 543 [115 Pac. 327]; and *Stanford University* v. *Rodley,* 38 Cal. App. 563 [177 Pac. 175]. But the present case is *not concerned with surface waters* and the foregoing decisions are not in point. The waters upon which the drains here in question act have *lost their character as surface waters before they reach the drains and have already been gathered into a definite body flowing as a stream in a watercourse.* The difference between surface waters and those collected and flowing in a watercourse is well recognized, and the same rules by no means apply to one as to the other." (Emphasis added.) Fifth, in the cases at bar the water which caused the damage was collected and discharged into La Ballona Lagoon and was thereby caused to be discharged or spread over land it had never before covered. Plaintiffs' land is three miles from the lagoon. This distinction appears from the statement at page 398:

"Likewise, the distinction should be observed at the outset between the present case and such decisions as *Rudel* v. *Los Angeles County,* 118 Cal. 281 [50 Pac. 400]; *Larrabee* v.

*Cloverdale,* 131 Cal. 96 [63 Pac. 143]; *Wood* v. *Moulton,* 146 Cal. 317 [80 Pac. 92], and *Humphreys* v. *Moulton,* 1 Cal. App. 257 [81 Pac. 1085], which are also cited on behalf of the plaintiff. These cases were all concerned with water in watercourses and *with improvements or changes in drainage.* So far they resemble the case at bar. But in all of them, *unlike the present case,* the improvement or change did *not have the effect merely of passing down the water in a stream* more completely and speedily from one point in its channel to another, but of diverting it entirely from its channel and discharging it either into a different channel in which it did not naturally flow or *upon neighboring land where there was no* channel.'' (Emphasis added.) Sixth, the plaintiffs' land here is not riparian to La Ballona Creek; it is three miles away and that creek never crossed it. In the San Gabriel case the stream whose bed was improved crossed plaintiff's land. For that reason he must assume the burdens as well as the benefits of riparian ownership, one of which is that certain repairs and improvements may be made in the bed of the stream above his land although the result is to his injury. In the instant cases the *stream never invaded plaintiffs' land* which is three miles therefrom, and to them the flooding of the waters onto their land is the *same as a diversion of the stream onto their property* which is admittedly an unlawful trespass. Even if it were conceded that an upper owner may with impunity, collect and discharge surface waters into a natural watercourse with the result that lower land *riparian* to that stream is flooded, defendants here would still be liable. Under such a concession the *reason* for no liability would be *that by reason of the riparian character of the lower owner's land, his riparian right and land might be said to be subject to a servitude* or easement owned by the upper owner, that is, the right of the upper owner to use the stream as a drainage channel. But in the cases at bar plaintiffs' land is three miles from the stream and is not subject to any such servitude. Furthermore, defendants have no property rights to which such an easement could be appurtenant. (More is said on that subject later herein.) Seventh, the court repeatedly points out in the San Gabriel case that there is no claim of the insufficiency or impropriety of the drainage system of defendant, but in the instant cases it is clear that the system was obviously improperly constructed and insufficient be-

cause no proper outlet was furnished for the discharged drainage water. Eighth, this court has recently held (July 31, 1941) that although it may be that an upper owner may collect surface waters and discharge them into a stream flowing through his land (citing the San Gabriel case as authority) he *may not* in so doing change the *natural conditions or alter the flow in the stream to the damage of the lower owner.* In *Everett* v. *Davis, supra,* at page 61, this court said:

''The appellants also seek to justify their actions upon the ground that the *highway ditch was the natural means of drainage*; that all of the water from Estes Wash flows into it at one point or another, and therefore *they were entitled to concentrate these waters by a channel and bring them to the ditch at one point.* Of course, one may gather and discharge surface waters into a stream which is their natural means of drainage. (*San Gabriel V. C.* v. *Los Angeles, supra.*) But before the acts complained of in the present case, the water naturally dispersed over the land, and that part of it which reached the ditch *had lost much of its force. After* the appellants constructed their fences, the *waters were sent through a narrow channel in a manner quite different from the natural flow.* Theretofore only some of these waters had flowed into the ditch at different points over a wide area; the channel contrived by the appellants *brought practically all of the flow of Estes Wash to one point with destructive* force. Under these circumstances the principle relied upon by the appellants has *no application.*'' (Emphasis added.) The majority opinion is squarely contrary to the Everett case. In the cases at bar the waters were gathered in excessive quantities in the La Ballona Lagoon contrary to natural conditions, and the inevitable flooding occurred.

As heretofore stated the majority opinion launches its discussion of the San Gabriel case on the premise that if a private owner would not be liable for the conduct with which the defendants are here charged, the public agencies, defendants in this case, would not be liable, and in the foregoing discussion I have accepted that premise, but it will not withstand a careful analysis. In fact, even a casual scrutiny reveals its fallacy. Defendants here may well be liable even though a private upper landowner might not be. That rule may be proper as a general proposition, if its application is limited. It is not applicable however, unless

the state is in the same position as a private individual who is not liable although inflicting damage because such damage occurs in the proper exercise by him of some *property right* possessed by him. If he is not liable it is because what he has done has been in the lawful enjoyment of a property right. (See *Stewart* v. *Birchfield,* 15 Cal. App. 378 [114 Pac. 999].) For illustration, if an upper riparian owner uses the portion of the water to which he is lawfully entitled, the lower owner may well be injured thereby because of an insufficiency of water to satisfy all of the needs of both of them. The lower owner though damaged, could not recover from the upper owner because the latter in making a reasonable use of the water was exercising a legal property right. That is the basis for the rule that there may be injury but not liability. As a general rule a person is not liable to another for an injury inflicted upon the latter if such injury occurs by reason of the lawful exercise by the former of his property right. In the illustration above-mentioned it would not be questioned that if someone who had no rights in the stream diverted the same quantity of water, the lower owner could hold him liable. The state or public agency is in no different category. When it has no property right to be exercised, it cannot escape liability for damaging a person's property, although such damage might not be actionable if caused by a private individual while lawfully exercising a property right. Lacking a property right, there are only two bases for a damaging of property by the state, namely, the power of eminent domain, where compensation must be paid, and the police power.

Defendants urge that the construction of the improvements here involved was a proper exercise of the police power and for that reason plaintiffs may not be compensated for the damages suffered by them. The majority opinion discusses the police power, but then for some unrevealed reason does not reach any conclusion with respect to its application to the cases at bar. It does not hold that the plaintiffs are barred from recovery because the flooding was done under the police power. It does state: "In certain circumstances, however, the taking or damaging of private property for such a purpose is not prompted by *so great a necessity* as to be justified without proper compensation to the owner. . . . The liability of the state under article I, section 14 of the

California Constitution arises when the taking or damaging of private property is *not so essential to the general welfare as to be sanctioned under "the police power."* (Emphasis added.) Manifestly, the correct test of whether or not the police power has been properly exercised is not and never has been the degree of public necessity. To be appropriate it must be for the public health, safety, morals, or general welfare. If the degree of public necessity be the test then the constitutional guarantee of just compensation for property taken for a public use is completely and forever abrogated. If a legislative body finds that public necessity requires the taking of property for highways, for streets, for a water supply, for recreational areas, for hospitals, for schools or other public buildings, or for a myriad of other public purposes, the courts must accept such a finding as conclusive. If such a finding is all that is necessary to warrant the exercise of the police power, there will be no occasion for the state or other public agency ever paying for any private property taken or damages for a public improvement. Who may say that property for schools, highways, streets, etc., is not absolutely necessary for the proper functioning of the government? Indeed, it is an indispensable factor in the exercise of the power of eminent domain where compensation is payable, that the public convenience and necessity demand the taking or damaging of any private property involved in the public improvement contemplated. Thus, under the theory advanced in the majority opinion, in any case that the power of eminent domain may be properly exercised, the police power could also be invoked with the result that no compensation could be recovered. Although it is difficult to charter the dividing line between the exercise of the two powers, it may be justifiably said that police power operates in the field of regulation, except possibly in some cases of public emergency such as a fire where buildings may be destroyed, rather than in the taking or damaging of property for some public improvement. A man may be prevented under the police power from so using or maintaining his property that it is detrimental to the public health, safety, morals or general welfare. Regulations may be invoked to prohibit such use and maintenance. But where neither his property nor its use or maintenance by him has any relation to the public good sought to be accomplished or evil to be

remedied, other than that the public desires to use his property, he should be compensated for the taking or damaging of it if the constitutional guarantee still exists. In the cases at bar plaintiffs' use and maintenance of their property have no relation to defendants' improvements. The distinction between the two powers is discussed in Lewis, Eminent Domain, 3rd ed., vol. 1, sec. 6, p. 13, as follows:

"Every one is bound so to use his own property as not to interfere with the reasonable use and enjoyment by others of their property. For a violation of this duty the law provides a civil remedy. Besides this obligation, which every property owner is under to the owners of neighboring property, he is also bound so to use and enjoy his own as not to interfere with the general welfare of the community in which he lives. It is the enforcement of this last duty which pertains to the police power of the State so far as the exercise of that power affects private property. Whatever restraints the legislature imposes upon *the use and enjoyment* of property within the reason and principle of this duty, the owner must submit to, and for any inconvenience or loss which he sustains thereby, he is without remedy. It is a *regulation, and not a taking,* an exercise of police power, and not of eminent domain. But the moment the legislature passes beyond *mere regulation,* and attempts to deprive the individual of his property, or of some substantial interest therein, under pretense of regulation, then the act becomes one of eminent domain, and is subject to the obligations and limitations which attend an exercise of that power. We shall defer until a subsequent chapter a discussion of the limits of the police regulation of private property and of the acts which, though under the guise of police regulation, amount to a taking of property for public use, and which, therefore, can only be accomplished under the power of eminent domain. It is sufficient for the present purpose to point out the distinction between the two powers. Under the one, the public welfare is prompted by regulating and restricting the use and enjoyment of property by the owner; under the other, the public welfare is promoted by taking the property from the owner and appropriating it to some particular public use." (Emphasis added.)

The majority opinion cites the case of *Gray* v. *Reclamation District No. 1500,* 174 Cal. 622 [163 Pac. 1024), in support

of the proposition that the state or its subdivisions may take or damage private property without compensation if such action is essential to safeguard public health, safety or morals. While it is true that the Gray case holds that the drainage and reclamation of lands, apart from any question of the navigability of streams, is a legitimate exercise of the police power of the state, it is in no respect an authority for holding that the damages suffered by plaintiffs in the cases at bar can be justified under the most liberal exercise of the police power that has ever been asserted by enthusiastic advocates of the extension of that power. While there is much *dictum* in the Gray case which has been seized upon by those desiring to extend the application of the police power doctrine into the field of eminent domain, I think it is clear that when the Gray case is studied and analyzed, it cannot be said that the principles of law therein announced in any way trench upon or purport to abrogate the provisions of section 14 of article I of our state Constitution prohibiting the taking or damaging of private property for public use without the payment of just compensation therefor. In the first place, the plaintiff in the Gray case sought to restrain the reclamation district, which was created by a statute passed by the legislature of this state, from carrying into effect the provisions of such statute which were designed to control the flood waters of the Sacramento and San Joaquin Rivers to the end that the navigability of those rivers would be improved, and lands which were in danger of being flooded during the period of run-off each year would be protected from injury as the result of such floods, and thousands of acres of land within the drainage area of said rivers would be reclaimed from a state of inundation and brought into a state of productive use. The injury complained of by plaintiff in the Gray case was prospective and temporary only and this court expressly stated that plaintiffs could protect themselves against it. At page 639 of the opinion in said case the court states:

"In the case at bar it is to be observed that the flooding, occasioned only by reason of the diminution of the area of the Sutter Basin, *will in the first place be but temporary and will end when the reclamation works in the Sutter Basin are completed, and, in the second place, may be protected against by the levee district,* in which most of plaintiff's lands are

situated, and by the other property owners by a back levee, or by the construction of the eastern levee of the Sutter Basin by-pass, for their proportionate expense in building which their lands would be liable under assessment by the Sacramento & San Joaquin Drainage District; while, upon the other hand, the builders would be entitled to compensation from that district for any excess expenditure over their due proportion which they might incur in the construction of the work.'' (Emphasis added.)

In discussing the application of section 14 of article I of our Constitution to the factual situation in the Gray case, this court stated at pages 645 and 646 as follows:

'' ' . . . It is insisted, however, that a distinction should be made because of the provision of our constitution that ''private property shall not be taken, appropriated or damaged for public use without just compensation therefor'' (Const. 1874, art. II, sec. 22). In reaching the conclusion above announced we are not unmindful of the constitutional provision, but where no right has been violated there is no injury for which the liability affords compensation and it is a case of an injury without damages.' The supreme court of Mississippi, under a constitutional provision like ours, where the acts complained of were the acts of its levee commissioners in controlling the waters of the river whose name the state bears, has held that the land owner is not entitled to compensation because the construction of the levee renders the land between it and the river worthless for agriculture and necessitates the removal of houses on to the protected side of the levees. (*Richardson* v. *Levee Commrs.*, 68 Miss. 539, [9 South. 351].)

''Nothing in any of our decisions in the slightest militates against this conclusion. *Reardon* v. *San Francisco*, 66 Cal. 492, [56 Am. Rep. 109, 6 Pac. 317], contains a discussion of the meaning of the word 'damage' as newly placed in the constitution. The holding was that it applied to *special* consequential damages which the owner of adjoining property received over and above the common injury to other abutters on the street or the general public, by reason of a street improvement. It based its conclusion largely upon the views of the Supreme Court of Georgia, reference to which has hereinbefore been made. No difficulty arises over this case, which by its very language is limited to special damage occa-

sioned to particular property which is not a common damage to all abutting property. Upon the other hand, in *De Baker* v. *Southern California Ry. Co.*, 106 Cal. 257, [48 Am. St. Rep. 237, 39 Pac. 610], this court in Bank, referring to the contention that because of the modification of our constitution, the doctrine of *Green* v. *Swift*, 47 Cal. 536, and *Green* v. *State*, 73 Cal. 29 [11 Pac. 602, 14 Pac. 610], and *Lamb* v. *Reclamation District*, 73 Cal. 125, [2 Am. St. Rep. 775, 14 Pac. 625], were no longer the law, passed it by with the statement merely that 'it is possible this may be true.' But here and now, therefore, for the first time is the question presented, and for the reasons above given, we hold that the doctrine of *damnum absque injuria* is applicable to the *prospective temporary consequential damage* which it may be found will be inflicted upon the plaintiffs' lands by the future raising of a flood plane, which floods are of temporary duration and character, *which raising the plaintiffs may protect themselves against*, and which floods, in the progress of the work, will be taken care of so that future injury will be avoided, all this under the state's plan of vast magnitude and importance to abate, on behalf of the whole state, as well as for the benefit of private land owners, including these plaintiffs, flood conditions, which, if unchecked, would inevitably lead to the destruction of the navigability of the river and to the greater impairment and damage of all the adjacent land. *Further than this it is not necessary here to go.*" (Emphasis added.)

It should be apparent to anyone familiar with the factual situation in the Gray case that it bears no similarity whatever to the factual situation in the cases at bar and that therefore the principles of law involved in that case are in nowise applicable to the cases now before us.

In the cases at bar the improvement has directly caused the damage suffered by the plaintiffs. In the Gray case the improvement instead of causing damage to the plaintiff would ultimately result in a benefit and improvement of his property; the damages involved being only prospective and temporary and *incidental to the construction of the improvement rather than the improvement itself*. Furthermore, as pointed out by this court in its decision in the Gray case, the plaintiff could protect his property against the prospective temporary damage to which his property was subjected, but the

plaintiffs in the cases at bar obviously had no such opportunity.

I cannot refrain from adverting to the recent but growing tendency of some courts and judges toward the destruction of constitutional guarantees by the process of specious interpretation. It may be that such constitutional guarantees are obnoxious to the social or economic philosophy of the judge or judges deciding the particular cause; but I submit that it is for the people and not the courts to bring about changes in our Constitution. To invoke the police power as a justification for the taking or damaging of private property for public use in violation of section 14 of article I of the Constitution of California is nothing less than amending the Constitution by judicial edict or nullification by sanction of law.

In the cases at bar, the public agencies here involved constructed a drainage system presumably for the benefit of the public, or a portion thereof. Conceding that such system was properly and efficiently constructed and maintained, but its operation necessitated the flooding of plaintiffs' premises situated three miles away, under what possible theory can it be argued that plaintiffs' property was not damaged for the public purpose of maintaining said drainage system? If it was so damaged, defendants are liable to plaintiffs under section 14 of article I of our Constitution. If, on the other hand, the system was improperly or inefficiently constructed or maintained, and the flooding of plaintiffs' premises resulted therefrom, the liability of defendants could be predicated upon the provisions of the 1923 statute (Stats. of 1923, p. 675, Deering's Gen. Laws, 1937, Act 5618), as well as the above-mentioned provision of the Constitution. In other words, defendants could not avoid liability for the damaging of plaintiffs' property because of their negligent conduct in the construction or maintenance of the public improvement if they would be liable therefor notwithstanding such negligent conduct.

Finally, it is stated in the majority opinion that the evidence does not establish that the bridge maintained across the lagoon by one of the defendants was a contributory cause of the flooding of plaintiffs' lands. I have heretofore set forth the facts in these cases and they manifestly show that the bridge blocked the flow of the water and the debris

thereby caused to collect was a contributing cause of the flooding. It must be remembered that these cases are here on appeal from judgments entered after orders granting non-suits, and all the evidence must be viewed and every reasonable inference drawn favorably to plaintiffs. There is undeniably sufficient evidence to require the submission of the cases to the jury on that question of fact.

Summing up, we have cases where public agencies, with no proprietary right so to do, have collected surface waters by the installation of drains, have discharged those waters into a natural watercourse, and have failed to provide adequate means of escape for those waters into the ocean well knowing that their conduct would cause the flooding of plaintiffs' premises. As a result of that conduct, the waters discharged in the watercourse exceeded its capacity and could not escape through the inadequate outlet, and plaintiffs' land and the improvements thereon, not riparian to the stream, being three miles away, and not having theretofore been subject to overflow by any of the waters, are flooded and damaged. The majority decision is contrary to the firmly established law in California and the weight of authority in other jurisdictions. It will not only result in a grievous miscarriage of justice in the cases now under consideration, but will cause great confusion in the law on the subject here involved.

In my opinion the judgments should be reversed.

CURTIS, J.—I concur in the conclusion reached in the dissenting opinion.

Appellants' petition for a rehearing was denied December 12, 1941. Curtis, J., and Carter, J., voted for a rehearing. Houser, J., did not participate therein. Spence, J., acting *pro tem.*