[Civ. No. 14397. Second Dist., Div. One. May 22, 1944.]

ABE ABROMS, Individually and as Administrator, etc., Appellant, v. NEW YORK LIFE INSURANCE COMPANY (a Corporation), Respondent.

John W. Preston and A. Joseph Shapiro for Appellant.

Meserve, Mumper & Hughes for Respondent.

WHITE, J.—Plaintiff Abe Abroms, individually and as administrator of the estate of Rose Abroms, his deceased wife, brought this action against defendant New York Life Insurance Company for reformation of an annuity certificate issued by the defendant, so as to cause the same to provide for a refund annuity with plaintiff Abe Abroms, individually, as beneficiary, instead of the life annuity certificate actually issued by defendant.

Trial before the court sitting without a jury resulted in a judgment in favor of defendant insurance company. From such judgment plaintiffs prosecute this appeal.

Prior to the trial of the instant case, defendant interposed a demurrer, both general and special, to the original complaint. The demurrer was sustained without leave to amend.

Plaintiff's request for leave to file a first amended complaint was denied, following which denial judgments of dismissal in favor of defendant were entered pursuant to the order sustaining the latter's demurrer. An appeal taken from said judgments resulted in a reversal thereof by this court with directions to the trial court to overrule defendant's demurrer and to permit the filing of the proffered first amended complaint should plaintiffs be so advised (*Abroms* v. *New York Life Ins. Co.*, 53 Cal.App.2d 764 [128 P.2d 391]).

Upon the going down of the remittitur, plaintiffs filed their first amended complaint. By its answer, defendant admitted the issuance of the original annuity policy, and the surrender thereof when the life annuity certificate was issued on July 1, 1939, and conceded that the certificate actually issued provided for a life annuity. As affirmative defenses, the answer alleged laches and estoppel; and further set forth that Rose Abroms had consented in writing to the issuance of a life annuity certificate.

The factual background surrounding this litigation may be thus epitomized:

Plaintiff Abe Abroms was born in Lithuania in 1875 and his wife in 1879. They were married in England in 1905, coming to the United States in 1914. After Abe Abroms had worked as a cabinet maker in the State of New York for about five years, he and his wife settled in Akron, Ohio, where, in 1919, they commenced the operation of a small neighborhood grocery store. Through their industry and thrift they accumulated a total sum of $18,000 by 1932. Due to the condition of their health and upon the advice of their doctor, Mr. and Mrs. Abroms liquidated their business and decided to remove their residence to California with the intention not to again engage in any active business or other work. Being desirous of investing a portion of their savings to provide security in their old age, they determined upon an investment of $10,000 of their competence with the view of receiving an income therefrom in the later years of their lives, retaining the balance of $8,000 to meet their necessities and requirements during the years intervening until the invested $10,000 should commence to return them an income. Accordingly, they consulted an agent of the defendant insurance company, unfolded to him their aims, hopes and plans. Acting upon the advice and counsel of defendant's agent, plaintiff Abe Abroms

and his wife purchased from the defendant on June 20, 1932, a single premium policy. This policy provided for the payment to Mrs. Rose Abroms of a life annuity of $79.10 per month "commencing on the anniversary of this Policy upon which the Annuitant's age at nearest birthday is 60 years; but, at any time prior to the commencement of such Annuity payments, the Annuitant may, provided the policy is then in force, elect in writing to receive in lieu thereof either:

"(1) A Life Annuity, as shown in Schedule I hereof, or

"(2) A Refund Annuity as shown in Schedule II hereof.

"The Company further agrees to pay to Abraham Abroms, husband of the Annuitant, Beneficiary, in the event of the receipt of due proof of the death of the Annuitant, a Death Benefit as shown in Schedule III hereof, if such death shall occur prior to the due date of the first Annuity payment hereunder; or, if a Refund Annuity has been elected and such death shall occur on or after the due date of the first Annuity payment, the Company agrees to pay to said Beneficiary the Annuity payments, if any, becoming due after the death of Annuitant, as set forth in the provision hereof entitled 'Annuity Payments'.

"The Company, upon surrender of this Policy on the anniversary elected for commencement of Annuity payments hereunder, will issue a Certificate in lieu thereof setting forth the rights and benefits as stated herein.

"This contract is made in consideration of the application therefor and of the payment in advance of the single premium of $10,000.00 representing Ten Premium-Units of $1,000 each . . . This policy takes effect as of the First day of July Nineteen Hundred and Thirty-two . . ."

In the year 1939, when the annuitant, Mrs. Rose Abroms, was approaching the stipulated age of 60 years, she and her husband visited the Los Angeles office of the defendant insurance company with a view of exercising the option provided for in "Schedule I" or "Schedule II" of the above named policy of 1932.

For the purpose of clarity, it might here be explained that the annuitant had the choice of one of two forms of continued annuity insurance when she reached the age of 60 years.

The form of certificate contemplated by "Schedule I" was called a "life annuity". This certificate provided for the payment to the annuitant Rose Abroms of the sum of $80.62

per month commencing with the first day of July, 1939, and continuing thereafter during the lifetime of said annuitant. However, all annuity payments under this form of certificate terminated with the death of the annuitant, Mrs. Rose Abroms.

The form of annuity certificate under "Schedule II", and which is called a "refund annuity" would be evidenced by a certificate which would provide for the payment of annuity payments in monthly instalments to the annuitant, Rose Abroms, until her death in the sum of $71.72, and upon her death there would be payable to the surviving husband, plaintiff Abe Abroms, as beneficiary, the annuity payments becoming due after the death of Rose Abroms.

By the amended complaint it is alleged that when plaintiff Abe Abroms and his wife called upon defendant insurance company at its Los Angeles office in 1939, they then and there informed defendant and its agents and employees that they were desirous of surrendering the 1932 policy according to the terms thereof for a certificate providing for a "refund annuity" which inured to the benefit of said husband, should the latter survive his wife, but that the defendant company issued to plaintiff Abe Abroms and his wife a certificate under "Schedule I" providing for a "life annuity" and that under the provisions of such certificate the annuity payments were to and did cease upon the death of said wife.

As heretofore noted, the life annuity certificate was issued as of July 1, 1939, and Mrs. Abroms died May 16, 1941, whereupon the defendant company refused to pay any further sums as annuities to the surviving husband, the plaintiff herein Abe Abroms.

On November 10, 1941, plaintiff in his individual, as well as in his representative capacity, commenced this action to reform the issued certificate so as to cause the same to provide for a "refund annuity" instead of a "life annuity".

Plaintiffs by their amended complaint specifically charged that on or about July 1, 1939, pursuant to the option or election plan provided for in the annuity policy of July 1, 1932, Abe Abroms and his wife, Rose Abroms, the annuitant named in said policy, went to the office of the defendant "for the purpose of notifying defendant that they were electing the refund annuity provided for in said policy and as shown in

'Schedule II' thereof, whereunder the annuity payments would be payable to Rose Abroms as the annuitant until her death commencing at her age sixty, and upon her death there would be payable to Abe Abroms, in his individual capacity and in his own right, as the designated beneficiary, the annuity payments becoming due after the death of Rose Abroms as set forth in the provisions of said policy entitled 'Annuity Payments';" and that plaintiff and his wife "then and there informed the defendant . . . that they desired to surrender the aforementioned policy for a certificate which would provide for a refund annuity;" that plaintiff and his wife "then and there ordered a certificate of such kind and type," but that defendant issued a different type of certificate, to wit one providing for a life annuity; and "falsely and fraudulently represented" that said certificate "provided for the refund annuity ordered by said plaintiff and his wife; that neither the plaintiff nor his wife examined the certificate and were ignorant of the fact that they were defrauded prior to the time when said wife died, because of their reliance upon the representations and statements so made by the defendant." On the issues of fraud thus made by the pleadings, the court found in favor of defendant. It was found that Rose Abroms had not asked for a "refund annuity" but for a "life annuity," and that she had received from the defendant the exact kind of an annuity certificate she ordered.

At the trial plaintiff Abe Abroms testified that neither he nor his wife could read English; that they did not read the original policy after it was issued to them in 1932, nor did they have any one read it to or for them; neither did they read or have read for them the "life annuity" certificate issued to them in 1939. That they relied solely upon the representations made to them by defendant and that at no time did defendant or its agents explain to plaintiff Abe Abroms or his wife the nature and ultimate effect of the annuity certificate issued to them.

A reading of the record in this case at once establishes the fact that plaintiffs' case depends for its virility and strength, in the main, upon the testimony of plaintiff Abe Abroms. That the court did not believe the testimony of said plaintiff is immediately apparent when reference is had to the "memorandum of opinion" rendered by the trial court at the conclusion of the trial, and wherein we find the following: "there

are two phases of his testimony which are so incredible that the Court would not be justified in making any finding based wholly upon his testimony. He testified that he and his wife came to this country in 1914 and after he had worked for several years as a cabinetmaker they opened a grocery store in Akron, Ohio, in 1919 which they operated until 1934, doing a business which they built up to a gross income of $350 to $400 per week; but that they never learned to read English and always read Jewish papers; and that the only thing that he could decipher so far as English is concerned was figures. I wrote upon a piece of blank paper the figures 1,000 preceded by a dollar sign ($), all written largely and clearly. This I handed to him and asked him what it said. After seeming great difficulty, frowning, holding the paper in various positions and taking an appreciable time, he said he could make out the figures 1,000. I asked him if there was nothing else he could make out upon the paper. He looked at it and said "no." I then pointed to the dollar sign and asked him if he knew what that was. He again looked at it carefully and said "no." The only thing he could understand there was the figures 1,000. The idea that this man could be in this country from 1914, could conduct a sizable retail grocery business in connection with which he would naturally deal with many wholesalers as well as retailers and build up a profit of $18,000, $14,000 of which was in the bank, and still at this late date be wholly unable to recognize the dollar mark is so utterly incredible as to be beyond belief. The other circumstance to which I refer and which is almost if not equally preposterous is his testimony that in the talks which he and his wife had with the agent in negotiating for an annuity contract in which they were to deposit $10,000 in cash with the New York Life Insurance Company neither of them at any time ever asked the agent how much monthly payment they were to receive for it and neither of them had any idea or made any inquiry as to this important feature. Upon his attention being directed to this by the Court he again reiterated that neither of them had ever asked any question along this line but that he and his wife privately had thought that maybe they might receive $100 a month. The idea that two people who were sufficiently shrewd and capable to go to a strange country, establish a business and amass a profit of $18,000 would be so naive as to turn a major portion

of this over to a company with whom they had never had any prior dealings and never make any inquiry as to what they were to receive for it is wholly out of line with human experience.''

As the first ground of appeal it is urged that the trial court erred in failing to follow the law of the case as established by the decision of this court in the former appeal herein (*Abroms* v. *New York Life Ins. Co., supra*).

In that connection appellants urge that the trial court was bound to follow as the law of the case the following principle enunciated by this court in the former appeal, wherein we said:

''If respondent's agents issued the Annuity Certificate here in question without an explanation to appellant and his wife of its ultimate effect, that act in itself would bring the parties within the provisions of section 3399 of the Civil Code.''

However, in giving consideration to the decision on the prior appeal to determine the extent to which the law of the case therein announced is applicable in determining the instant controversy it must be borne in mind that the former appeal was from a judgment based upon an order sustaining a demurrer to the complaint without leave to amend. In that proceeding, being upon demurrer, it was required that the truth of the allegations contained in the complaint be assumed. Acting upon that assumption, this court held on the former appeal that the complaint stated a cause of action, ordered that the demurrer be overruled and that the proffered amended complaint be filed. But, unless the evidence adduced at the trial proved the allegations of the complaint which was considered upon the former appeal, the doctrine of the law of the case does not apply. In other words, if the trial court was justified, as we are persuaded it was, in holding that appellants' evidence failed to substantiate the allegations of the complaint and the amended complaint, then the decision of this court in passing upon the demurrer interposed to the original complaint was not binding upon the trial court as the law of the case, nor is it binding upon this court on this appeal, in passing upon the sufficiency of the evidence to support the allegations of the pleadings (*Allen* v. *California Mutual Building & Loan Association*, 22 Cal.2d 474, 481, 482 [139 P.2d 321]; *Archer* v. *City of Los Angeles*, 19 Cal.2d 19, 29 [119 P.2d 1]).

There can be no doubt as urged by appellants that the original contract of insurance issued in 1932, providing for an annuity to Mrs. Abroms at age sixty was taken out by the insured upon the advice and counsel of defendant's agent, whose testimony shows that at the request of a friend he called upon them, and Mrs. Abroms explained to him "that they had worked hard for many years in this grocery store and they had been very thrifty, that they had not had a chance to spend any money because the hours were long and that it had taken a lot out of them; and as near as I can recall, Mr. Abroms was sick at the time; that they had bought the building and sold it and had accumulated about $18,000 in cash, and that they wanted to put some of it in a safe place with the idea that they did not want to lose any of their money and then be poverty stricken, so I recommended this particular contract at age sixty." However, no claim can successfully be made that both Mr. and Mrs. Abroms did not understand the nature of the policy originally issued to them in 1932, or were not satisfied that its terms met their desires and requirements. They both understood that when Mrs. Abroms attained the age of sixty years an annuity would be paid under the terms of this policy. That they so understood and were aware of the option or election afforded them to choose a particular type of annuity certificate is demonstrated by the very allegations of plaintiffs' complaint, wherein it is averred that they went to the Los Angeles office of the defendant insurance company "for the purpose of notifying defendant that they were electing the refund annuity."

With reference to appellants' testimony that neither he nor his wife could read English, it is significant that at the time they contracted for the policy in 1932 they made no such suggestion to the defendant's agent, Mr. Krakover, and the testimony of Elizabeth O. Busch, the defendant's Los Angeles Office employee with whom Mr. and Mrs. Abroms conferred in 1939, when exercising their election, was that neither of them at the time documents were presented for their signature suggested their inability to read English, nor did either of them request Miss Busch to read the documents to them.

Coming now to a consideration of the circumstances immediately preceding, and at the time of the issuance of the

life annuity certificate to Mrs. Abroms, we find the evidence highly conflicting. There was, it is true, testimony that Mrs. Abroms was in serious ill health; that she was suffering from a severe heart malady, complicated by other ailments. As her physician testified, "she was warned by me that she had a bad heart and that her condition was not good." The death certificate executed by the doctor gave as the immediate cause of Mrs. Abroms' death, which occurred less than two years after issuance of the life annuity certificate, "cerebral hemorrhage, duration, sudden, due to hypertension and chronic myocarditis, duration, several years." Appellants argue that it is inherently improbable in view of the state of Mrs. Abroms' health, that either she or her husband would understandingly accept a life annuity upon her life when they could have obtained a refund annuity which would have inured to the benefit of Mr. Abroms in the event of the death of his wife. In this regard, however, we must bear in mind that the record is equally clear that Mr. Abroms himself was far from being in good health, and in fact was in rather bad health. As far back as 1914 he was sick in Rochester, New York, and unable to work, about 1930 he underwent an operation for appendicitis which developed into a peritonitis condition and was told by the attending physician that "he had only one chance in a thousand to live." Subsequently in California, and within less than two years prior to the time when Mrs. Abroms was required to make her election under the policy, Mr. Abroms suffered a severe fainting spell which rendered him unconscious and as a result, as stated by the trial court "was advised by the doctor that he should take it easy, that he had trouble with his heart, that he must give up smoking and must even refrain from taking an occasional drink of whiskey to which he had been accustomed for the purpose of giving himself strength." Occurrences at the trial, while Mr. Abroms was upon the witness stand, also indicated that he was in failing health. Furthermore, he was several years older than his wife and testified at the trial "I had it in my mind maybe I will go first."

As we view the record we are impressed that the trial court was justified in concluding that the motive actuating Mrs. Abroms in selecting the life annuity certificate instead of the refund annuity certificate was because "she wanted the most money she could get out of it," as Miss Busch, one of de-

fendant's employees, testified Mrs. Abroms stated to her. And Miss Busch further testified, "I told her if she took a refund annuity she would obtain—— if she took a refund annuity, the amount would be smaller and if she took a non-refund it would be greater." This same witness testified un-equivocally as follows:

"Q. Did you at any time ever explain to Mrs. Abroms that if a life annuity certificate were taken, that the company would make no further payments even though she died three days after having taken that type of certificate?

"A. I explained that there would be no refund of any kind. She emphatically insisted that she wanted the most money she could get out of that policy during her lifetime, and I had no right to sway her opinion, her selection. I did tell her under one option she would get less and under the other one she would get more."

A reading of the record in this case furnishes convincing evidence that Mrs. Abroms was at all times the dominating figure in transactions with the defendant insurance company; that she conducted all of the negotiations. In fact, plaintiff Abe Abroms himself testified in the trial court that his wife did all the talking, that he stood alongside, taking no part in the discussion, while in his deposition he said in answer to a question, "I didn't say nothing, the lady was talking to the Mrs. because it was in her name."

While appellants direct our attention to certain testimony given by representatives of the defendant company from which it is argued there is established inferentially at least, fraud, mutual mistake, or mistake of one party which the other at the time knew or suspected, we must nevertheless, for the purposes of this appeal, wherein all intendments are in favor of the findings made and the judgment rendered, accept that portion of the testimony favorable to respondent. With that rule in mind, we find in the record further testi-mony given by Miss Busch, defendant's employee with whom the Abroms dealt at the time they applied for and obtained the annuity certificate, and wherein Miss Busch testified as follows:

"Q. Did you explain to Mr. and Mrs. Abroms on that occasion what a refund type of annuity policy was?

"A. Yes.

"Q. And what did you tell them in that regard?

"A. Well, as I said, she wanted the greatest amount that she could possibly get out of that annuity, and I told her that if she wanted that, she would have to leave her dividends, not draw it in cash, and she would have to take what is known as a nonrefund annuity, that she would not get anything back in case of her death.

"Q. Did you explain to either of them or both of them, the difference between a refund annuity and a life annuity, or did you just assume that she knew what that was?

"A. Yes, I explained it to her. I didn't assume she knew what it was, but I didn't get far in my explanation because she was very—when I said anything at all—she would go back and tell me she wanted the most money she could get out of that while she was alive, and I didn't have a chance to make much of an explanation at any time to her.

"Q. Do I understand you to mean by your answer, Miss Busch, when you started your explanation she would interrupt you?

"A. She would.

"Q. In what form were her interruptions?

"A. She would put her hand down on the counter and she would say, 'I want all the money I can get out of this policy while I am alive every month.'

"Q. Now, what did you tell her, did you say anything to her about a non-refund annuity, what it was?

"A. Yes, I went into that quite thoroughly with her."

We have searched the record in vain for any testimony that would contradict the assumption by the court that in all their dealings with defendant insurance company both Mr. and Mrs. Abroms accepted documents tendered them, apparently examined them, and signed them without at any time asking that the contents of such documents be read or explained to them by the representative of the insurance company or by any one else. That such would be the conduct of two illiterate people who had $10,000 invested is not borne out by human experience with the propensities and habits of people, nor by either the course of business or the course of nature. There isn't a scintilla of evidence that either Mr. or Mrs. Abroms was tricked into signing any documents by agents or employees of defendant insurance company, and there is a total lack of any showing that they were prevented by de-

fendant's agents from reading such documents, while there is positive testimony that neither Mr. or Mrs. Abroms at any time made any request to have the documents read to them or that they asked permission to take such documents to any other person for the purpose of having the contents thereof read or explained to them. The finding of the trial court that there was no fraud, either actual or constructive, practiced by the defendant upon plaintiffs finds ample support in the evidence as well as in the inferences fairly and reasonably deducible therefrom.

As heretofore pointed out, because appellants' evidence fails to prove the allegations of the amended complaint or to sustain the issues made by such pleading or raised by the evidence, the doctrine of the law of the case enunciated on the former appeal, wherein the sufficiency of the allegations of the original complaint to state a cause of action was considered, does not apply.

The evidence in this cause fails to establish a case which merits the application of the extraordinary remedy of revising a written contract of the parties herein (Civ. Code, § 3399). The evidence does not establish constructive fraud as that term is defined by section 1573 of the Civil Code; nor a mutual mistake or a mistake as set forth in section 1577 of the Civil Code. Neither does the evidence, taken as a whole, together with the inferences to be reasonably drawn therefrom, establish the fact that there was no meeting of the minds or mutuality of consent between all of the parties concerned (Civ. Code, § 1580). On the other hand there is substantial evidence in the record to support the conclusion arrived at by the trial court that the "life annuity" certificate expressed the intention of the parties; was what the annuitant desired and gave to her "the most money" of the two alternative certificates available to her under the policy of 1932, which was what she said she wanted and in which her husband, at least by his silence, if not by any spoken word, acquiesced.

For the foregoing reasons, the judgment is affirmed.

York, P. J., and Doran, J., concurred.