CITY OF PASSAIC, A MUNICIPAL CORPORATION, PLAINTIFF-APPELLANT, v. CITY OF CLIFTON, A MUNICIPAL CORPORATION, AND DEPARTMENT OF CONSERVATION AND ECONOMIC DEVELOPMENT OF THE DIVISION OF WATER POLICY AND SUPPLY OF THE STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS.

Argued November 16, 1953—Decided December 21, 1953.

138

Mr. *William N. Gurtman* argued the cause for appellant.

Mr. *Mervyn R. Montgomery* argued the cause for respondent City of Clifton (Mr. *John G. Dluhy*, attorney).

Mr. *Thomas P. Cook* argued the cause for respondent Division of Water Policy and Supply (Mr. *Theodore D. Parsons*, Attorney-General of New Jersey, attorney).

The opinion of the court was delivered by

WILLIAM J. BRENNAN, JR., J. This appeal of the City of Passaic, certified here of our own motion, is from a resolution of the Division of Water Policy and Supply denying a petition which sought to have the Division impose conditions upon permits issued to the City of Clifton authorizing the construction of a box culvert in MacDonald Brook, a tributary of the Passaic River.

MacDonald Brook is a natural stream flowing from its source in Clifton through Passaic to the Passaic River and draining approximately 1133 acres of land, about one-half in each city. Flood conditions from its overflow, brought about largely by the increased run-off of waters into the

Brook due to the intensified industrial and residential development of the two cities, are and have been a continuous and growing hazard. While Passaic is already substantially developed, Clifton is still growing. Passaic's municipal engineer has the opinion that over the next quarter century the further development of the cities will increase the run-off of waters into the brook by 7% in Passaic and 49% in Clifton. Each municipality has been planning for some time to make improvements to the brook within its limits to alleviate and protect against the flood danger.

Passaic formulated a plan as early as 1939, and effected some parts of it. More extensive improvements were planned, which took into consideration the prospective increased volume coming downstream as a result of the augmented run-off into the brook in Clifton, but anticipated an increased volume in the natural flow of waters only. However, the Clifton improvement approved by the Division of Water Policy and Supply calls for the enclosing of parts of the brook in Clifton's limits within a box culvert; and the waters running through that culvert will course downstream at a velocity substantially greater than the natural flow. At present the waters from the Clifton side enter the brook in Passaic through a 36-inch pipe. The Passaic plan calls for replacement of that pipe with a culvert of greater intake capacity. Using either method, the present pipe or the proposed culvert, the prospective increased velocity at which the water will reach Passaic after the Clifton improvement is completed caused Passaic's municipal engineer to anticipate a problem which could be met only by the revision of Passaic's plan at an increase in the cost of its improvement of 23%, or $180,000.

After Clifton obtained *ex parte* its permits, dated July 27, 1951 and May 20, 1952, Passaic's municipal engineer, under direction of Passaic's Director of Public Works, submitted to the Division for approval, also *ex parte*, the plan embodying the more expensive improvement. It was approved and a permit issued on November 17, 1952. About six months later, on May 11, 1953, Passaic filed its petition alleging

that the "proposed improvement of the City of Clifton does not safeguard the interests of the City of Passaic, its property owners and its residents." After full hearing and the taking of expert testimony offered by both cities, the Division, on June 15, 1953, adopted the resolution appealed from, incorporating therein the following findings:

"1. That the work authorized under the permits is necessary for the welfare of the inhabitants of the City of Clifton and their protection against the danger of flood waters;

2. That the natural waterway of MacDonald Brook downstream from the City of Clifton through the City of Passaic has been encroached upon by residents and property owners of the City of Passaic and the necessity for improving the stretch of the stream in Passaic has been recognized by that municipality;

3. That application for said improvement of MacDonald Brook in Passaic has been submitted and was approved November 17, 1952 under application No. 2212;

4. That the work authorized for the City of Clifton and the design approved for the improvement in the City of Passaic provide a coordinated, practical and economic solution for alleviation of floods on MacDonald Brook in the Cities of Clifton and Passaic;

5. That the Clifton improvement provides for the suppression of flood discharge on the City of Passaic for floods in excess of the capacity of the Clifton culvert.

6. That upon completion of the improvement approved for alleviating floods within the City of Passaic, the work authorized for the City of Clifton will not increase flood danger to the City of Passaic; in the meantime, the quantity of water that can be discharged by the Clifton improvement will be limited by the capacity of the structure which encloses MacDonald Brook in Passaic at the Passaic-Clifton line;".

What Passaic asks is that this court remand the cause to the Division with direction to impose conditions adequate to relieve Passaic of the additional expense of $180,000. Passaic does not question the Division's finding that the Clifton improvement is necessary to protect Clifton against the flood danger, but argues in effect that Clifton should be permitted to proceed under its permit only if it does something to decelerate the velocity of the flow which causes Passaic the additional expense.

R. S. 58:1-1 et seq., L. 1929, c. 267, commits to the Division of Water Policy and Supply the administration of

a broad legislative policy for the conservation and control of the waters of the State, *Jersey City v. State Water Policy Comm.*, 118 *N. J. L.* 72 (*E. & A.* 1937). In aid of that and the other statutory objectives section 11 of the 1929 act, *R. S.* 58:1–26, provides:

"No structure within the natural and ordinary high water mark of any stream shall be made by any public authority or private person or corporation without notice to the [Division of Water Policy and Supply], and in no case without complying with such conditions as the [Division] may prescribe for preserving the channel and providing for the flow of water therein to safeguard the public against danger from the waters impounded or affected by such structure, * * *. No such approval * * * shall impair or affect any property rights, otherwise existing, which might be invaded by the construction or maintenance of any such structure."

Passaic insists that under this section "the jurisdiction of the Division is broad enough to cover any equitable determination." It is at once evident that this statutory agency is not invested with powers of such broad sweep. It is a regulatory body merely, *Ronade Associates, Inc., v. Dept. of Conservation, etc.*, 7 *N. J. Super.* 132 (*App. Div.* 1950), and the factors appropriate for its consideration in the determination whether to impose conditions upon the approval of a structure "to safeguard the public against danger from the waters impounded or affected by such structure" are, as was said in *Jersey City v. State Water Policy Comm., supra,* "circumscribed" by "those considerations" which are "necessary to subserve the general statutory objectives." It affirmatively appears that the revised and approved Passaic plan makes adequate provision against any hazard to Passaic's residents incident to the accelerated velocity of the waters coming from Clifton. The Clifton and Passaic plans taken together constitute, as the Division found, "a coordinated, practical and economic solution for alleviation of the floods on MacDonald Brook in the Cities of Clifton and Passaic." There is thus ample basis for the conclusion implicit in the Division's action that the public of both cities will be prop-

erly safeguarded against the flood danger. In the circumstances whether Passaic should be saddled with the increased expense was a matter with which the Division was "not concerned and would have no right to determine," cf. *Town of Boonton v. State Water Policy Commission*, 122 *N. J. L.* 34 (*Sup. Ct.* 1939) ; see also *Collingswood v. State Water Supply Commission*, 85 *N. J. L.* 673 (*E. & A.* 1914). This is not to say that an expense of this nature is an immaterial factor in every case. The Division's duty is to be solicitous that the public is safeguarded against the danger from the waters impounded or affected by a structure. If the Clifton improvement would create a flood hazard to the inhabitants of Passaic against which Passaic was financially or otherwise unable to protect them, the consideration of the imposition of conditions upon Clifton would be plainly indicated. But that is not the case here.

Passaic refers us to testimony of methods by which the velocity of the flow can be reduced, (1) by "pondage" within Clifton, that is, by storing the water in an artificially created pond or lake causing it gradually to flow therefrom into and down the brook to Passaic, (2) by pumping the water into the Passaic River. But, in light of the provision made by Passaic to protect its residents and the testimony given by Passaic's own expert that the cost of "ponding" would be "very great" and of pumping "prohibitive," we cannot say that the Division acted arbitrarily or unreasonably in not requiring Clifton to adopt one of these methods. It was sufficient that the Division was justified in finding that the plans in combination assure that the public of both cities will be protected against flood danger. It is not consistent with the Division's responsibility that it should chance the possibility that the added great cost of either method might imperil Clifton's ability to proceed with its improvement. And Passaic's expert conceded that the proposed Clifton culvert is so designed that any flow above the normal intake capacity of the existing .36-inch pipe will "tend to create internal ponding" within the culvert in Clifton. The inference is that the danger to Passaic may be overemphasized.

■■ Passaic also contends that Clifton has not shown that its plan cares for and disposes of the waters by a drain or drainage system, referring us to *R. S.* 40:69–1 authorizing any municipality to "cover over any natural stream or watercourse running through the municipality, or part thereof at such place or places as it shall judge advisable, and change the alignment or course thereof, provided the water of such stream or watercourse be properly cared for and disposed of by a drain or drainage system." This statute was enacted by *L.* 1925, *c.* 139, four years before the 1929 act. The municipal power given by the earlier law may now be exercised only after compliance with the later one. The finding that the waters are properly cared for and disposed of is necessarily implicit in the finding that the Clifton and Passaic plans together provide a coordinated solution for the possible flood danger in both communities.

■ We have not overlooked the provision of *R. S.* 58:1–26 that "No such approval by the [Division] shall impair or affect any property rights, otherwise existing, which might be invaded by the construction or maintenance of any such structure." This provision plainly imports that when the Division reasonably finds that the structure is in furtherance of the objectives of the law and that such members of the public as may be affected are properly safeguarded against danger from the waters impounded or affected by it, the Division is not to be concerned that the structure may invade any property rights. See *Town of Boonton v. State Water Policy Commission, supra.* Any such invasion is to be redressed by remedies otherwise available to those affected. Passaic's argument that the Division was obliged to impose conditions "so that Passaic suffer no impairment of property right" is in that sense wholly without merit.

We may say in passing that we have difficulty in discovering the asserted "property right" of Passaic which may be invaded by Clifton's structure. Clifton is not altering a watercourse, *cf. Inhabitants West Orange Tp. v. Field*, 37 *N. J. Eq.* 600 (*E. & A.* 1883) ; *Kehoe v. Borough of Rutherford*, 74 *N. J. L.* 659 (*E. & A.* 1907), and *Peter Wendel &*

*Sons, Inc., v. City of Newark*, 138 *N. J. Eq.* 69 (*Ch.* 1946), nor collecting surface waters and discharging them on private lands, cf. *Gould & Eberhardt, Inc., v. City of Newark*, 6 *N. J.* 240 (1951). Clifton is merely constructing an improvement in the natural watercourse for the purpose of the drainage and protection of lands within its confines, and there is respectable authority that any result from the flow of water in the brook when it reaches Passaic is *damnum absque injuria*. *Archer v. City of Los Angeles*, 19 *Cal. 2d* 19, 119 *P. 2d* 1 (*Sup. Ct.* 1941); see also *Town of Union ads. Durkes*, 38 *N. J. L.* 21 (*Sup. Ct.* 1875).

A matter of procedure warrants comment. Unlike the sections in respect of the approval of plans for a new or additional water supply, *R. S.* 58:1–17 to 24, *In re Plainfield-Union Water Co.*, 11 *N. J.* 382 (1953), or in respect of the interconnecting of public water supply systems, *R. S.* 58:1–25, express statutory provision is not made for prior notice and hearing in respect of the approval of a structure required under *R. S.* 58:1–26. Both the Clifton and the Passaic permits were issued, as noted, on *ex parte* applications. Passaic received its hearing only after subsequently petitioning the Division for a determination whether conditions should be imposed upon Clifton. If a statutory requirement for notice and hearing is not essential to due process, see *Adams Theatre Co. v. Keenan*, 12 *N. J.* 267, 278 (1953), this case illustrates that the solution of an applicant's water problem can seriously concern other members of the public and provides cogent evidence of the wisdom of the practice, which we were told by the Attorney-General on the oral argument is now ordinarily followed by the Division, of giving prior notice and hearing before action upon the application.

Affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—6.

*For reversal*—Justice HEHER—1.